**In the Interest of J.W. and D.S.G., Minor Children.**

No. 05–99–00705–CV.

Court of Appeals of Texas, Dallas.

Aug. 18, 2003.

David Griffin, Susan Warren Griffin, Balch Springs, pro se.

Michael Steven Warren, Bonham, pro se.

John Alan Goren, Charles W. McGarry, Dallas, Deborah J. Pritchett, Carrollton, Lela D. Mays, Law Office of Lela D. Mays, Dallas, for Appellant.

Grier Pat Jones, Kerry Fitzgerald, Assistant District Attorney, Dallas, for Appellee.

Cheryl D. Holder, Kenneth Jefferson Bray, Assistant District Attorneys, Dallas, for the State.

Before Justices JAMES, BRIDGES, and MARTIN RICHTER.

## OPINION

Opinion by Justice BRIDGES.

Susan Warren Griffin and David Griffin appeal the trial court's judgment terminating Susan's parental rights to J.W. and D.S.G. and David's rights to D.S.G., following a jury verdict that termination of Susan's and David's parental rights was in the best interests of J.W. and D.S.G. In seven issues, David argues (1) the trial court abused its discretion in failing to continue the trial due to pending criminal charges against him; (2) the cases against David and Susan and Michael Warren, J.W.'s father, should have been severed; (3) the trial court improperly instructed the jury in the disjunctive; (4) fatal charge error occurred; (5) the evidence is legally and factually insufficient to support termination of the parent-child relationship; (6) he was denied effective assistance of counsel; and (7) the trial court improperly dismissed his motion for new trial. Susan has adopted David's first and second issues. In addition, she complains the trial court should not have instructed the jury in the subjunctive, the evidence is factually insufficient to support the termination of her parental rights, and she was denied effective assistance of counsel. We affirm the trial court's judgment.

Susan is the mother of seven children. At the time of the 1996 removals that are the subject of this action, Susan had two daughters, seventeen-year-old S.W. and thirteen-year-old A.W., and five sons, sixteen-year-old J.W., twelve-year-old M.W., three-year-old J.W., and newborn D.S.G.

David Griffin is the father of D.S.G. Michael Warren is the father of all of the children except D.S.G. At the time of trial, Warren was in jail for sexually abusing his oldest daughter, S.W. Although Warren's parental rights were terminated in the underlying action, he is not a party to this appeal.

In the years leading up to the removals at issue here, Child Protective Services (CPS) received forty-six referrals regarding Susan and her children. Joyce Coleman, an investigative caseworker for CPS testified she received an initial referral on Susan in October 1994 regarding medical neglect. That referral was ruled out, but CPS received another referral, five days after the initial referral, for physical neglect. Coleman went to Susan's house and saw holes in the walls, roaches, and trash on the floor. The house smelled of "urine and trash." Coleman considered the house to be a "somewhat" dangerous environment for the children, but she did not remove them at that time. Two days later, Coleman received another referral on Susan for physical neglect. Coleman again went to Susan's house and there was still "trash here and there and clothes here and there" but the situation was not extreme. The children were dirty, and their clothes were dirty, but they did not appear malnourished. Coleman discussed homemaker services with Susan to help keep the house clean, but Susan said the services were not helpful or the children would just mess up the house again.

In December 1994, Coleman received another referral on Susan for physical neglect, but Coleman was unable to determine if physical neglect was occurring. In March 1995, Coleman received a report of alleged sexual abuse of Susan's daughters who had been seen in bed with a neighbor named "J.L." Coleman investigated, but she was unable to determine if sexual abuse had occurred. CPS received another referral for physical neglect in May 1995 but closed the case after investigating. In June 1995, Coleman visited Susan's home, and conditions in the home were worse than she had ever seen: a window pane was gone, trash and diapers were in the yard, dirty water was in the bathroom sink, feces were in the toilet and on the floor, moldy food was in the kitchen, and no bedding was on several mattresses. Coleman considered the house a health risk and a safety hazard, but she could not remove the children because they ran away. The next day, Coleman returned to the house with the sheriff and removed five of Susan's children, including J.W.

David testified he married Susan on July 4, 1995 after moving into Susan's house in June 1995. According to David, Susan's oldest daughter resented him and would "junk the place up." David admitted that the conditions in which the children were living in the home were not acceptable all the time. David also admitted he had trouble disciplining Susan's other children. On more than one occasion, one of Susan's sons was in the front yard shooting a bow and arrow. Once the boy shot an arrow at a dog and another time he shot at a man walking on the sidewalk. As a result, an animal control officer and a police officer came to the house to investigate. David testified he was charged with injury to a child for actions he took to discipline the boy. A court order was entered requiring David to move out of the house. David moved out of the house on August 15, 1995, and Susan's two daughters were returned to the home. Bobby Chesher, a CPS caseworker, testified Susan's three sons were returned to the home in December 1995.

Danny Greer, one of Susan's neighbors, testified he heard one of Susan's children being hit by an adult inside the house one

day. Greer called police and held a cordless phone to Susan's window so that the police could hear the beating that was taking place. Greer heard Susan yelling, "Quit fucking hitting him." Greer went back to his yard and waited until police came. The police went inside Susan's house and brought David out and arrested him. Greer testified this incident occurred about a year before the bow and arrow incident which Greer also witnessed. Greer further testified he had seen a child he identified as three-year-old J.W. walking down the sidewalk alone at 8:30 or 9:00 p.m. one evening. J.W. was dressed in only a dirty diaper. Greer's wife, Julie, testified she saw J.W. "walking down the middle of the street with a diaper on, no other clothes, no shoes, no t-shirt or anything." One day Julie found J.W. alone in her yard, which is diagonally across the street from Susan's house. Again, J.W. was dressed only in a diaper that "had obviously not been changed for several hours." Julie picked up J.W. and carried him home. There were no other children or adults outside at the time, and Julie had to knock on Susan's door to give J.W. to one of his sisters. Julie testified she saw J.W. outside unsupervised on several other occasions.

In March 1996, CPS received another referral for physical neglect regarding all of Susan's children. Susan's home was described as dirty and filthy with a smell so bad "you can barely get inside the house." The referral indicated, and Chesher confirmed through his investigation, that the two middle boys had vandalized a neighbor's house and were caught smoking. The boys were climbing in and out of an open window at Susan's house instead of using the door. There was trash and debris in the yard. Based on the condition of the home and Susan's past history, Chesher removed J.W. at that time because it was his opinion that J.W., a

toddler, was subject to more accidents and injuries than the older children. A petition for termination of Susan's parental rights was filed almost immediately after J.W.'s removal.

On April 15, 1996, Susan, pregnant with D.S.G., was struck by a car while she was riding down the middle of the street in her wheelchair. Susan was taken to the hospital, and she gave birth to D.S.G. that day. Greer went with his wife and several other neighbors to Susan's house to check on the children. The house was very dirty, there were holes in the walls, and it smelled like sewage. The children went to stay with David's brother, Kenneth Griffin. Kenneth contacted Chesher, who went to Kenneth's home to assess the situation. Outside Kenneth's house there was more trash than at Susan's, but inside conditions were more sanitary. However, hanging on a wall was cardboard and paper taped together with CPS reports and statements Chesher had made and a dead rat hanging in the middle of it. Nevertheless, Chesher believed the children were safe with Kenneth, and they remained there. About a month later, Susan came home from the hospital with D.S.G., and David moved back in to Susan's house.

In July 1996, Chesher received a referral on "Baby Warren," D.S.G., indicating the house where he was living with Susan was filthy, and the family was "very dirty." Until he received the referral, Chesher was not aware that Susan had a baby. The referral said several animals including dogs, ducks, and pigs were living in the house, and there were animal feces "all over the place." All of the house's windows and doors were always open, the referral stated, and the baby's father, David, would sit outside with the baby in the sun for hours. Chesher went to the house, but nobody answered the door. Chesher looked in a window and saw

someone walk past. Finally, Susan and David answered the door and, after initially refusing to answer, Susan told Chesher her baby was in the house. After looking around the home and taking pictures, Chesher made it clear to David and Susan that he was going to remove D.S.G. There was "a lot of screaming and yelling," and Chesher went next door and called the police. Police arrived and assisted with the removal.

At the time of the removal, D.S.G. was attached to an apnea monitor, a device that sets off an alarm if the baby's breathing slows or stops. However, David and Susan would not let Chesher take the monitor with him. Initially, Susan refused to tell Chesher the name of D.S.G.'s doctor, but she eventually gave Chesher the doctor's name and, using a car seat provided by David and Susan, Chesher took D.S.G. to the doctor's office. During the subsequent examination, Chesher noticed tiny roaches crawling out of the car seat. Although the car seat was supposed to be white, it was brown and had fragments that appeared to be rat droppings in it. David's parental rights to D.S.G. and Susan's parental rights to J.W. and D.S.G. were terminated, and this appeal followed.

In his first issue, adopted by Susan, David argues the trial court abused its discretion in failing to continue the trial in this case because criminal charges were pending against him at the time of trial. At the time of trial, section 161.2011(a) of the family code provided the following:

> (a) The court shall not proceed to final trial in a suit to terminate the parent-child relationship during the time that any criminal charges filed against a parent whose rights are subject to termination in the suit are pending if the criminal charges are directly related to the grounds for which termination of the parent's rights are sought unless it determines that it is in the best interest of the child.

TEX. FAM.CODE ANN. § 161.2011(a) note (Vernon 2001). Here, at the time of trial David was charged with injury to a child for "disciplining" one of Susan's sons. Shortly before trial, Susan was charged with two counts of child endangerment for allegedly failing to report that another of her sons was sexually assaulting one of his sisters. Neither case involved the termination of David's or Susan's rights to J.W. or D.S.G., and none of the charges were directly related to the grounds for which termination of David's and Susan's rights to J.W. or D.S.G. were sought. *See id.* Accordingly, the trial court did not err in denying a continuance on the basis that criminal charges were pending against David and Susan. We overrule David's and Susan's first issue.

In his second issue, adopted by Susan, David argues the trial court erred in denying his motion for severance. Rule 41 of the rules of civil procedure provides that "[a]ny claim against a party may be severed and proceeded with separately." TEX.R. CIV. P. 41. This rule grants the trial court broad discretion in the matter of severance and consolidation of causes. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex.1990). The trial court's decision to grant a severance will not be reversed unless it has abused its discretion. *Id.* A claim is properly severable if (1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted, and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues. *Id.*

Here, the same assertion was made against David and Susan: that their parental rights should be terminated. The same

facts and issues concerning the condition of the home that David and Susan shared, the care and supervision J.W. and D.S.G. did or did not receive, and the best interest of J.W. and D.S.G. were closely interwoven with the issue of whether David or Susan's parental rights should be terminated. *See id.* Accordingly, we cannot conclude the trial court abused its discretion in refusing to sever the cases against David and Susan. *See id.*

■ Also in his second issue, adopted by Susan, David and Susan argue the trial court erred in denying their pretrial motions to prevent the admission of evidence of their arrests and pending prosecutions. Specifically, David and Susan argue the probative value of the evidence of their arrests was substantially outweighed by the danger of unfair prejudice. *See* TEX.R. EVID. 403. We review a trial court's admission or exclusion of evidence for an abuse of discretion. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). Because the best interest of the child must be the court's primary consideration in a suit affecting the parent-child relationship, rule 403 is an extraordinary remedy that must be used sparingly. *See In re C.Q.T.M.,* 25 S.W.3d 730, 736 (Tex.App.-Waco 2000, pet. denied); *Trevino v. Tex. Dep't of Protective and Regulatory Servs.,* 893 S.W.2d 243, 248 (Tex.App.-Austin 1995, no writ).

Here the evidence that David was arrested for beating one of Susan's sons and Susan was arrested for failing to report that another of her sons was sexually assaulting one of her daughters, while not "directly related" to the grounds for which termination of their parental rights was sought, was relevant to a determination of the relationship they would have with J.W. and D.S.G. and their parenting skills. *See In re C.Q.T.M.,* 25 S.W.3d at 736. Thus, the evidence of the arrests and pending

prosecutions was relevant in determining whether allowing David or Susan to retain their parental rights would be in the children's best interest. *Id.* Under these circumstances, we conclude the evidence of David's and Susan's arrests was relevant, and the probative value of that evidence was not substantially outweighed by the danger of unfair prejudice. *See* TEX.R. EVID. 403. We overrule David and Susan's second issue.

■ In David's third issue and Susan's first and second issues in her brief, they argue the jury charge was improper because it charged the jury in the disjunctive as follows:

> You are instructed that in order to terminate the parental rights in this case between a parent and a child, you must find by clear and convincing evidence that the parent:
>
> 1a. Has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child,
>
> OR
>
> 1b. Has engaged in conduct or knowingly placed the child with persons who engaged in the conduct which endangers the physical or emotional well-being of the child,
>
> You are further instructed that even if you find from clear and convincing evidence that 1a or 1b above occurred, before termination can be ordered by the court, you must additionally find by clear and convincing evidence that termination of the parent-child relationship between the parent and the child is in the best interest of the child.

The charge then posed the question "Do you find from clear and convincing evidence that the parent-child relationship

between the [parent] and the child ... should be terminated?" David and Susan argue that this disjunctive charge improperly instructed the jury it could terminate their parental rights under either of two required findings under section 161.001 of the family code, thereby failing to require that the same ten jurors make the same required finding by clear and convincing evidence. We disagree.

■ In all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions. Tex.R. Civ. P. 277. The charge in parental rights cases should be the same as in other civil cases. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990). The controlling question is whether the parent-child relationship between the parent and child should be terminated, not what specific ground or grounds under the controlling statute the jury relied on to answer affirmatively the questions posed. *Id.* In so holding, the supreme court approved both the instruction, which disjunctively submitted the alternative grounds for termination, as well as the broad-form submission of the controlling issue: whether the parent-child relationship should be terminated. *Id.; In re M.C.M.*, 57 S.W.3d 27, 31 (Tex.App.-Houston [1st Dist.] 2001, pet. denied); *see In re J.M.C.A.*, 31 S.W.3d 692, 699 (Tex. App.-Houston [1st Dist.] 2000, no pet.) (not necessary for trial court to submit separate questions in parental termination case). Thus, we conclude the trial court properly submitted the controlling issues in this case through its broad-form submission. We overrule David's third issue and Susan's first and second issues in her brief.

■ In his fourth issue, David makes the related argument that the charge was improper because it did not submit separate questions asking the jury if it found (1) each parent had engaged in conduct prohibited by section 161.001 of the family code and (2) termination was in the best interest of the child. Because these questions were not submitted separately, David argues, there is no explicit finding that he committed an act of endangerment or that termination of his parental rights was in his child's best interest. Furthermore, David argues that, without such explicit findings, there are no findings supporting the judgment, and it must be reversed. Again, we disagree. We have already concluded the trial court's submission of the controlling issues in this case through its broad-form submission was proper. *See E.B.*, 802 S.W.2d at 649. Accordingly, we decline to hold that the charge in this case was defective for failing to submit separate questions as to David's prohibited conduct and the best interest of the child. David further argues the charge "failed to restrict the jury's considerations in several other respects" by including certain improper definitions. However, as David concedes, no objection was made to these matters. Accordingly, David has waived our review of these issues. Tex.R.App. P. 33.1(a). We overrule David's fourth issue.

■ In David's fifth issue, he challenges the legal and factual sufficiency of the evidence to support the termination of his parental rights. In Susan's third and fourth issues, she challenges the factual sufficiency of the evidence to support termination of her parental rights. In reviewing the legal sufficiency of the evidence, we consider only the evidence and inferences tending to support the dispositive findings and disregard all evidence and inferences to the contrary. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 83 (Tex.App.-Dallas 1995, no writ). If there is more than a scintilla of evidence supporting the dispositive findings, we uphold the jury findings. *Id.* In reviewing the factual sufficiency of

the evidence to support termination findings, we examine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the State's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex.2002).

Before parental rights can be involuntarily terminated, the trial court must find (1) the parent has committed one of the enumerated statutory conditions, and (2) termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001 (Vernon 2002). The burden of proof necessary to involuntarily terminate parental rights is proof by clear and convincing evidence. *Id.* Here, the trial court terminated David's and Susan's parental rights under sections 161.001(1)(D) and 161.001(1)(E) of the family code. To terminate parental rights under section 161.001(1)(D), the evidence must show the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *Id.* § 161.001(1)(D). This section refers only to the acceptability of the child's living conditions. *See In re S.H.A.*, 728 S.W.2d 73, 84 (Tex.App.-Dallas 1987, writ ref'd n.r.e.). To terminate parental rights under section 161.001(1)(E), the evidence must show the person "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(1)(E). This section refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act. *In re S.H.A.*, 728 S.W.2d at 85.

"Endanger" means to expose to loss or injury; to jeopardize. *In re M.C.*, 917 S.W.2d 268, 269 (Tex.1996) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987)). Although "endanger" means more than a

threat of metaphysical injury or the possible ill effects of a less than ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffer injury. *Id.*

Regarding J.W., the record shows that CPS received numerous referrals concerning Susan's neglect of J.W. and her other children. Greer testified he had seen J.W. walking down the sidewalk alone at 8:30 or 9:00 p.m. one evening. J.W. was dressed in only a dirty diaper. Greer's wife, Julie, testified she saw J.W. "walking down the middle of the street with a diaper on, no other clothes, no shoes, no t-shirt or anything." One day Julie found J.W. alone in her yard, which is diagonally across the street from Susan's house. Again, J.W. was dressed only in a diaper that "had obviously not been changed for several hours." When Julie attempted to return J.W. to his home, there were no other children or adults outside at the time, and Julie had to knock on Susan's door to give J.W. to one of his sisters. Julie testified she saw J.W. outside unsupervised on several other occasions. In June 1995, Coleman visited Susan's home, and conditions in the home were worse than she had ever seen: a window pane was gone, trash and diapers were in the yard, dirty water was in the bathroom sink, feces were in the toilet and on the floor, moldy food was in the kitchen, and no bedding was on several mattresses. Coleman considered the house a health risk and a safety hazard and removed J.W.

Regarding D.S.G., the record shows that, after the removal of J.W., Susan was struck by a car and gave birth to D.S.G. prematurely. When Susan returned home with D.S.G. about a month later, David moved back into the house. Chesher received a referral on D.S.G. indicating the house where he was living with Susan and David was filthy, and the family was "very

dirty." The referral said several animals including dogs, ducks, and pigs were living in the house, and there were animal feces "all over the place." All of the house's windows and doors were always open, the referral stated, and the baby's father, David, would sit outside with the baby in the sun for hours. Chesher went to the house, but nobody answered the door. Finally, Susan and David answered the door and, after initially refusing to answer, Susan told Chesher her baby was in the house. After looking around the home and taking pictures, Chesher made it clear to David and Susan that he was going to remove D.S.G. There was "a lot of screaming and yelling," and Chesher went next door and called the police. Police arrived and assisted with the removal.

At the time of the removal, D.S.G. was attached to an apnea monitor, a device that sets off an alarm if the baby's breathing slows or stops. However, David and Susan would not let Chesher take the monitor with him. Initially, Susan refused to tell Chesher the name of D.S.G.'s doctor, but she eventually gave Chesher the doctor's name and, using a car seat provided by David and Susan, Chesher took D.S.G. to the doctor's office. During the subsequent examination, Chesher noticed tiny roaches crawling out of the car seat. Although the car seat was supposed to be white, it was brown and had fragments that appeared to be rat droppings in it.

■ We conclude this evidence is legally and factually sufficient to show that David and Susan knowingly placed or knowingly allowed J.W. and D.S.G. to remain in conditions or surroundings which endangered their physical or emotional well-being and engaged in conduct or knowingly placed J.W. and D.S.G. with persons who engaged in conduct which endangered their physical or emotional well-being. *See* TEX. FAM.CODE ANN.

§ 161.001(1)(D), (E); *In re S.H.A.*, 728 S.W.2d at 84–85. In addition, this evidence is legally and factually sufficient to support a finding that termination was in the best interests of the children. In determining the children's best interest, the fact finder may consider the children's current and future physical and emotional needs, as well as the current and future physical and emotional danger the children may confront. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976) (setting out list of nonexclusive factors to consider when determining best interest of child). We conclude that, based on the J.W.'s and D.S.G.'s living conditions and David and Susan's acts and omissions, the evidence is legally and factually sufficient to show that termination of David's and Susan's parental rights was in the best interests of J.W. and D.S.G. *See* TEX. FAM.CODE ANN. § 161.001(2) (Vernon 2002); *Holley*, 544 S.W.2d at 371–72. We overrule David's fifth issue and Susan's third and fourth issues.

■ In David's sixth issue and Susan's fifth, sixth, and seventh issues, they complain they were deprived of effective assistance of counsel because trial counsel (1) failed to object to the admission of evidence of David's and Susan's arrests and pending criminal charges, (2) failed to object to "numerous errors" in the jury charge, (3) failed to object to forty-six CPS referrals entered into evidence, and (4) failed to show that some of J.W.'s medical symptoms, including microcephaly and dental problems, could have been the result of juvenile cerebral palsy.

The Texas Supreme Court has held that the statutory right to counsel in parental-rights termination cases embodies the right to effective counsel. *In re M.S.*, 46 Tex. Sup.Ct. J. 999, 1006, 115 S.W.3d 534, 544, 2003 WL 21512654, * 9 (July 3, 2003); *see* TEX. FAM.CODE ANN. § 107.013. We

evaluate claims of ineffective assistance of counsel by the standard in *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *In re M.S.*, 46 Tex. Sup.Ct. J. 999, 1006, 115 S.W.3d 534, 544, 2003 WL 21512654, * 9 (July 3, 2003). To prevail on an ineffective assistance of counsel claim, an appellant must show (1) counsel's performance fell below an objective standard of reasonableness, and (2) a reasonable probability exists that, but for trial counsel's errors, the result would have been different. *Strickland*, 466 U.S. at 687–88, 694, 104 S.Ct. 2052. The record must be sufficiently developed to overcome a strong presumption that counsel provided reasonable assistance. *Thompson v. State*, 9 S.W.3d 808, 813–14 (Tex.Crim.App.1999). An appellate court looks to the totality of the representation and the particular circumstances of each case in evaluating the effectiveness of counsel. *Id.* at 813.

In light of our opinion rejecting David's and Susan's legal and factual sufficiency and charge complaints, they cannot show that they were harmed by counsel's failure to develop alternative theories to explain certain of J.W.'s medical problems and failure to object to (1) the admission of evidence of David's and Susan's arrests and pending criminal charges, (2) the jury charge, or (3) prior CPS referrals. Further, the record is silent as to counsel's reasons for the complained-of failure to object or failure to develop alternative theories concerning J.W.'s medical history. *See Thompson*, 9 S.W.3d at 813–14. Accordingly, we overrule David's sixth issue and Susan's fifth, sixth, and seventh issues.

■■■■ In his seventh issue, David argues the trial court erred in dismissing for want of prosecution his motion for new trial. Apparently, trial counsel timely filed a motion for new trial but confused the time the motion was set for a hearing and

failed to appear at the hearing. David complains that a motion for new trial may not be "dismissed." On the contrary, a motion may be dismissed for want of prosecution if the movant fails to prosecute the motion with diligence. *Christian v. Christian*, 985 S.W.2d 513, 514 (Tex.App.-San Antonio 1998, no pet.). We cannot conclude the trial court abused its discretion in dismissing David's motion for new trial when his counsel failed to appear at the hearing on the motion. *See id.* We overrule David's seventh issue. We affirm the trial court's judgment.