# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00314-CV

**Tyrone Rashad Davis, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

**FROM THE COUNTY COURT AT LAW NO. 4 OF WILLIAMSON COUNTY**
**NO. 09-3273-FC4, HONORABLE JOHN MCMASTER, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

This is an appeal from an order terminating the parental rights of appellant Tyrone Rashad Davis following a jury trial. In two issues on appeal, Davis asserts that the trial court abused its discretion in admitting evidence of an assault charge that was currently pending against him and that the evidence is factually insufficient to support the finding that termination is in the child's best interest. We will affirm the termination order.

## BACKGROUND

The Texas Department of Family and Protective Services (the Department) filed a petition seeking to terminate Davis's parental rights to his daughter, A.D., who was less than two years old at the time the petition was filed. The termination suit was based in part on allegations that Davis had knowingly placed or knowingly allowed the child to remain in conditions or

surroundings which endanger the physical or emotional well-being of the child; engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; failed to comply with the provisions of a court order that specifically established the actions necessary to obtain the return of the child; and used a controlled substance in a manner that endangered the health or safety of the child. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O), (P) (West Supp. 2011). The suit was tried to a jury. Evidence considered by the jury, which we will summarize below as it becomes relevant to our analysis, included the testimony of Department witnesses who had personal knowledge of the facts of the case and the surrounding circumstances that led to the Department's decision to seek termination; Roberta Thompson, the relative with whom A.D. had been placed and who was seeking to adopt the child; and Davis and members of his family. The jury also considered evidence of Davis's past drug use and criminal history, including evidence of multiple convictions and a pending assault charge. At the conclusion of trial, the jury found by clear and convincing evidence that one or more of the alleged grounds for termination were proven and that termination was in the child's best interest. *See id*. § 161.001(1), (2). In accordance with these findings, the trial court rendered a final order terminating Davis's parental rights. This appeal followed.

## ANALYSIS

**Admissibility of evidence concerning Davis's pending assault charge**

In his first issue, Davis asserts that the trial court abused its discretion in admitting evidence of the pending assault charge. The alleged assault had occurred while Davis was incarcerated in the Williamson County Jail for a separate offense. At trial, Davis objected to

2

the admission of this evidence on the basis that it was not relevant and, in the alternative, that it was more prejudicial than probative.  *See* Tex. R. Evid. 401, 403.  The trial court overruled both objections but provided the following limiting instruction to the jury before the evidence was first offered:

> The jury is instructed that the immediate line of questioning will relate to a charge which is currently pending against Mr. Davis and of which he has not been convicted. The jury shall therefore keep in mind that the case has not been litigated and neither the [j]udge nor jury has convicted Tyrone Davis of the pending charge.

The Department then elicited the following testimony from Davis relating to the pending charge:

> Q.  While you were incarcerated in the Williamson County Jail during this case, did you pick up another charge?
>
> A.  I would like to plead the Fifth on that.
>
> Q.  Okay.  More specifically, were you charged with assault during the pendency of this case while you were in the Williamson County Jail?
>
> A.  Also like to plead the Fifth on that.
>
> . . . .
>
> Q.  In your opinion, do you think committing a criminal offense could have an effect on the outcome of a CPS case?
>
> A.  Yes, sir.
>
> Q.  How do you think that would have an effect on a CPS case?
>
> A.  Because of the way people may view it.
>
> Q.  How would people view it?
>
> A.  That it's—that you call a case, it's a criminal case, your misconduct or whatever for.

3

The Department then moved on to other aspects of Davis's criminal history. Later, during questioning by both the attorney ad litem for the child and the attorney ad litem for the child's biological mother, Davis was again asked about the pending assault charge, and he again pleaded the Fifth Amendment. *See* U.S. Const. amend. V. Additionally, Davis's mother later testified that she was aware of the pending assault charge. Davis's father was also questioned about the pending charge but claimed that he was not aware of it.

On appeal, Davis argues that "the effect of letting in the unfounded evidence of assaultive behavior was unreasonable because it effectively acts as if there is an existing conviction." In Davis's view, the admission of the evidence prejudiced the jury against him, denied him a fair trial, and "probably caused the rendition of an improper judgment." Davis also complains that the trial court's limiting instruction was "far too vague" and "never specifically mentions self-defense," which was apparently Davis's anticipated defense to the pending assault charge.

As an initial matter, the Department argues that the admissibility of evidence relating to the pending assault charge is not properly before us because Davis failed to raise the issue in his statement of points. At the time the trial court rendered its final order, former section 263.405(i) of the family code provided that "[t]he appellate court may not consider any issue that was not specifically presented to the trial court in a timely filed statement of the points on which the party intends to appeal or in a statement combined with a motion for new trial." Act of May 12, 2005, 79th Leg., R.S., ch. 176, § 1, 2005 Tex. Gen. Laws 332, 332, *repealed by* Act of May 5, 2011, 82nd Leg., R.S., ch. 75, § 5, 2011 Tex. Gen. Laws 348, 349.[1] Applying the plain language of

---

[1] The Act repealing 263.405(i) was effective September 1, 2011. The Act provides, "A final order rendered before the effective date of this Act is governed by the law in effect on the date the

4

the statute, this Court in the past has declined to consider issues that were not raised in a timely filed statement of points. *See, e.g.*, *Hernandez v. Texas Dep't of Family & Protective Servs.*, No. 03-10-00061-CV, 2011 Tex. App. LEXIS 4068, at *2 (Tex. App.—Austin May 27, 2011, no pet.) (mem. op.); *Warner-Lapasinskas v. Texas Dep't of Family & Protective Servs.*, No. 03-09-00156-CV, 2009 Tex. App. LEXIS 9442, at *15-16 (Tex. App.—Austin Dec. 9, 2009, no pet.) (mem. op.); *Gamez v. Texas Dep't of Family & Protective Servs.*, No. 03-09-00190-CV, 2009 Tex. App. LEXIS 9269, at *18-20 (Tex. App.—Austin Dec. 1, 2009, no pet.) (mem. op.). However, in a more recent opinion involving a termination order rendered prior to the repeal of section 263.405(i), this Court decided to address an evidentiary sufficiency complaint that had not been raised in a timely filed statement of points, "in light of the fundamental liberty interest at issue and in the interests of justice." *See LeShore v. Texas Dep't of Family & Protective Servs.*, No. 03-10-00480-CV, 2011 Tex. App. LEXIS 9007, at *9-13 & n.2 (Tex. App.—Austin Nov. 10, 2011, pet. filed) (mem. op.). In so doing, this Court cited opinions from other courts that have rejected or modified the restrictions on the right to appeal embodied in former section 263.405. *See In re S.K.A.*, 236 S.W.3d 875, 894 (Tex. App.—Texarkana 2007, pet. denied) (concluding that barring appellate review of termination proceeding under subsection 263.405(i) for indigent parent not provided with appellate counsel is fundamentally unfair and, therefore, deeming statement of points timely filed); *In re D.R.L.M.*, 84 S.W.3d 281, 291 (Tex. App.—Fort Worth 2002, pet. denied) (determining that failure to file statement of points by fifteen-day deadline does not deprive court

order was rendered, and the former law is continued in effect for that purpose." Act of May 5, 2011, 82nd Leg., R.S., ch. 75, § 5, 2011 Tex. Gen. Laws 348, 349. The order in this case was rendered on June 3, 2011.

of jurisdiction over appellate issues if appellant timely filed notice of appeal); *cf. In re J.O.A.*, 283 S.W.3d 336, 347 (Tex. 2009) (finding that subsection 263.405(i) was unconstitutional to extent that it prevented court from addressing appellant's claims when appellant's lawyer filed motion to withdraw from case after final order was signed but failed to file statement of points and when appellate counsel was not appointed until after fifteen-day deadline); *In re D.M.*, 244 S.W.3d 397, 414-15 (Tex. App.—Waco 2007, no pet.) (concluding that subsection 263.405(b) and 263.405(i) violated appellant's due process rights where appellate counsel was not appointed until after deadline for filing statement of points).

Assuming without deciding that we are not precluded from addressing the admissibility of the pending assault charge, this issue would nevertheless fail on the merits. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005); *Murray v. Texas Dep't of Family & Protective Servs.*, 294 S.W.3d 360, 367 (Tex. App.—Austin 2009, no pet.). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex. 2004); *Murray*, 294 S.W.3d at 367.

At trial, Davis's objections to the admission of the evidence were limited to Rules 401 and 403.[2] Rule 401 provides that relevant evidence is admissible. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action

---

[2] Davis did not object on the basis of Rules 404(b) (concerning the admissibility of other crimes, wrongs, or acts for purposes other than proving character conformity) or 608(b) (concerning the admissibility of specific instances of conduct of a witness for purposes of impeachment). *See* Tex. R. Evid. 404(b), 608(b). Accordingly, any error in admitting the evidence on those grounds has been waived. *See* Tex. R. App. P. 33.1.

6

more probable or less probable." Tex. R. Evid. 401. Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403.

In a termination proceeding, the Department must prove one of the alleged statutory grounds for termination and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001 (West Supp. 2011). "Therefore, any evidence that makes it more or less likely that [the alleged statutory ground occurred] or that relates to [the child's] best interest is relevant." *Murray*, 294 S.W.3d at 368. There is ample precedent for the proposition that evidence of criminal conduct, even if the alleged conduct has not resulted in a conviction, is relevant to the determination of whether a parent's rights should be terminated. *See, e.g.*, *In re J.W.*, 113 S.W.3d 605, 612 (Tex. App.—Dallas 2003, pet. denied) (father arrested for assault and mother arrested for failing to report assault; court held that "the evidence of the arrests and pending prosecutions was relevant in determining whether allowing [the parents] to retain their parental rights would be in the children's best interest"); *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (concluding that appellant's inability to maintain lifestyle free from arrests and incarcerations supported jury's endangerment finding and was also relevant to best-interest determination); *Trevino v. Texas Dep't of Protective & Regulatory Servs.*, 893 S.W.2d 243, 248 (Tex. App.—Austin 1995, no writ) (concluding that appellant's criminal conduct and imprisonment were relevant to best-interest determination); *see also In re S.R.*, No. 10-10-00063-CV, 2010 Tex. App. LEXIS 9681, at *11-12 (Tex. App.—Waco Dec. 8, 2010, pet. denied) (mem. op.) (holding that evidence of arrest and pending charge for DWI was admissible for purpose of determining best interest of child); *cf. In re*

7

*K.L.R.*, 162 S.W.3d 291, 305 (Tex. App.—Tyler 2005, no pet.) (concluding, in conservatorship-modification proceeding, that mother's pending criminal charges were admissible for purpose of determining what was in child's best interest). Based on this precedent, the trial court would not have abused its discretion, i.e., acted in an arbitrary or unreasonable manner without reference to any guiding rules or principles, in concluding that the pending assault charge was relevant in determining whether termination was in the best interest of the child.

Nor would the trial court have abused its discretion in concluding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *In re D.O.*, 338 S.W.3d 29, 37 (Tex. App.—Eastland 2011, no pet.); *Murray*, 294 S.W.3d at 368; *In re K.Y.*, 273 S.W.3d 703, 710 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Because the best interest of the child must be the court's primary consideration in a suit affecting the parent-child relationship, rule 403 is an "extraordinary remedy that must be used sparingly." *Murray*, 294 S.W.3d at 368; *J.W.*, 113 S.W.3d at 612; *In re C.Q.T.M.*, 25 S.W.3d 730, 736 (Tex. App.—Waco 2000, pet. denied); *Trevino*, 893 S.W.2d at 248-49. Furthermore, the burden is on the opposing party to demonstrate how the evidence is unfairly prejudicial and substantially outweighs the probative value of the evidence. *See Murray*, 294 S.W.3d at 369. On this record, the trial court would not have abused its discretion in concluding that Davis failed to satisfy this burden. Davis points to nothing in the record to show that the admission of the evidence confused or misled the jury, was needlessly cumulative or caused undue delay in the trial, or unfairly prejudiced the jury against Davis to such a degree that it substantially outweighed

8

the probative value of the evidence. *See D.O.*, 338 S.W.3d at 37; *Murray*, 294 S.W.3d at 369; *J.W.*, 113 S.W.3d at 612; *C.Q.T.M.*, 25 S.W.3d at 736-37; *Trevino*, 893 S.W.2d at 248-49.

Finally, even if the trial court had abused its discretion in admitting the evidence, we could not conclude on this record that Davis was harmed by its admission. "Even if a trial court errs by improperly admitting evidence, reversal is warranted only if the error probably caused the rendition of an improper judgment." *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007); *see* Tex. R. App. P. 44.1(a)(1). "We review the entire record, and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted." *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004); *see Trevino*, 893 S.W.2d at 249. In other words, we look to the role the evidence played in the context of the trial. *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 873 (Tex. 2008). "Thus, if erroneously admitted or excluded evidence was crucial to a key issue, the error was likely harmful." *Id*. "By contrast, admission or exclusion is likely harmless if the evidence was cumulative, or if the rest of the evidence was so one-sided that the error likely made no difference." *Id*.

As we explain in more detail below, a key issue in the trial was Davis's criminal history. However, the pending assault charge was only a small fraction of that history. The jury also heard evidence that Davis: (1) had been convicted in 2010 of the offense of assault-family violence in an incident involving the mother of his child; (2) had been paroled for that offense but had his parole revoked for committing a subsequent assault against the same woman; (3) had been convicted in 2003 of the offense of assault-family violence in an incident involving another woman; (4) had admitted guilt in another assault involving his girlfriend's mother; (5) had been placed on ten years' deferred-adjudication probation in October 2008 for the offense of felony theft; (6) had been placed

9

on probation in 1998 for the offense of aggravated robbery, had violated his probation in 2003 by testing positive for cocaine and methamphetamine, and had been sent to prison for four years as a result of the violation; (7) had been convicted in 1998 of the offenses of unlawfully carrying a weapon and burglary of a coin-operated machine; and (8) had been convicted in 1997 of the offense of theft. Given this history and the other evidence supporting termination that we discuss below, we could not conclude that the judgment turned on the evidence of the pending assault charge, particularly in light of the lack of specific information conveyed during trial about the pending charge and the trial court's instruction to the jury admonishing it that Davis had not been convicted of the alleged offense.[3] We overrule Davis's first issue.

**Sufficiency of the evidence supporting the best-interest finding**

To terminate parental rights, the proponent must prove by clear and convincing evidence that a parent committed one or more of the acts or omissions set forth in Section 161.001(1) of the family code and that termination is in the child's best interest. *See In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re B.L.D.*, 113 S.W.3d 340, 353-54 (Tex. 2003); *Richardson v. Green*, 677 S.W.2d 497, 499 (Tex. 1984); *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980). In Davis's second

---

[3] We disagree with Davis's contentions that the limiting instruction was "far too vague" and that it should have included a reference to the law of self-defense. The instruction specifically informed the jury that the charge was "currently pending" and that "the case has not been litigated and neither the [j]udge nor jury has convicted Tyrone Davis of the pending charge." *See J.H. v. Texas Dep't of Family & Protective Servs.*, No. 03-10-00638-CV, 2011 Tex. App. LEXIS 4434, at *11-12 (Tex. App.—Austin June 9, 2011, no pet.) (mem. op.) (approving similar limiting instruction regarding allegations of criminal conduct in parental-termination case). And, because the case had not been litigated, we cannot conclude that the trial court abused its discretion in omitting a reference to the law of self-defense, which is a defensive theory that would be raised, if at all, at the time the case was tried.

issue, he asserts that the evidence is factually insufficient to support the finding that termination is in the child's best interest.[4]

"[T]he appellate standard for reviewing termination findings is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see also* Tex. Fam. Code Ann. § 101.007 (West 2008) ("'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."). In a factual sufficiency review, we must "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We "should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient."

There are numerous factors a trier of fact may consider in determining the best interest of the child, including but not limited to: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the

---

[4] Davis does not challenge the sufficiency of the evidence supporting the finding that he committed one or more of the alleged statutory grounds for termination.

11

child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The supreme court has "never held that these considerations are exhaustive, or that all such considerations must be proved as a condition precedent to parental termination." *C.H.*, 89 S.W.3d at 27. Moreover, "[t]he absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.* We will review the evidence presented during trial in light of the above factors.

### *The desires of the child and the emotional and physical needs of the child now and in the future*

A.D., who was less than three years old at the time of trial, did not testify. However, evidence of a young child's desires may be inferred from evidence tending to show that a child has bonded with her current caregivers and has not bonded with her biological parents. *See In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.); *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *In re M.D.S.*, 1 S.W.3d 190, 200 (Tex. App.—Amarillo 1999, no pet.). Roberta Thompson, Davis's cousin and the current primary caregiver of A.D., testified that A.D. refers to her as "Mom" and to Thompson's husband as "Dad" or "Daddy." Thompson added, "And I have had her since she was ten months old, and basically I'm the only mother that she's associated with and that she actually knows, so she calls me mother."

When asked what effect A.D.'s removal from Thompson's care would have on the child, Thompson answered, "It would devastate her." When asked why, Thompson explained,

> Because we are the only parents that she knows. We are the only one [sic] that has been there for her and loved her during her time of learning how to walk, learning how to crawl, going to school. Now she's—she goes to Headstart now. She's learning her ABCs and stuff. She's been potty training, and she's made so much progress. . . .

On the other hand, Davis testified that he had been A.D.'s primary caregiver for the first three months of the child's life, from August to October 2008, and for less than a month since that time. Also, Davis's mother, Kathleen Eason, testified that when A.D. was first born, Davis "was always taking care of the baby." According to Thompson, however, A.D. does not currently have a relationship with her biological father. Thompson's opinion regarding A.D.'s lack of a relationship with Davis was supported by the testimony of Betsy Brightman of Child Protective Services (CPS), who was the case supervisor at the time of trial. Brightman explained,

> Mr. Davis has been in [A.D.'s] life I believe a total of four months out of two and a half years. She has no relationship with him. She's very bonded to where she is. I think Mr. Davis has been given many opportunities to be a parent to her and to do his service plan so he can work toward getting her back. That has not happened. In the meantime, she has bonded with the family she's with. She considers them her parents. She does not have a relationship with him. She's done very well there, she's thriving.

Brightman also provided testimony regarding A.D.'s emotional and physical needs. Brightman testified that "[c]hildren need permanency in order to develop into healthy, stable . . . young adults and adults. They need to . . . have the security that they have a family that they will not be taken away from. . . . It helps in their development, especially very young children, not to be

13

removed from people they know and love and who they have grown attached to." Brightman testified that in order for A.D. to be adopted by Thompson, which was the Department's goal in this case, Davis's parental rights to A.D. had to be terminated. In Brightman's opinion, the termination of Davis's parental rights was in A.D.'s best interest. Brightman testified that in addition to the emotional stability that A.D. would receive from the adoption by Thompson and her husband, A.D. would also receive financial and medical benefits. Brightman explained, "[T]here's an adoption subsidy that would be provided to the Thompsons that would help provide quality care for her. And then when she's college age, her tuition would be paid if she went to a state school in Texas, so her education is completely paid for as well."

### *The emotional and physical danger to the child now and in the future and the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one*

Brightman further testified that Davis had repeatedly placed A.D. in situations that were dangerous to the child's welfare, including using and selling drugs while A.D. was in his care. Also of concern to the Department was Davis's relationship with A.D.'s biological mother, Crystal Jones, who was in jail at the time of the termination trial and who had allegedly abused drugs and worked as a prostitute after A.D.'s birth. According to Brightman, Davis was aware of Jones's drug and prostitution activity but nevertheless had placed A.D. in Jones's care on multiple occasions. The Department was also concerned with the documented history of domestic violence between Davis and Jones and the danger to the child that such violence presented. In fact, according to CPS investigator Linsay Tomlinson, A.D. had injured her head during one such altercation between

14

her parents. Additionally, as we mentioned above, Davis had an extensive history of engaging in criminal conduct.

In his testimony, Davis admitted to many of the Department's allegations. Davis acknowledged the domestic violence incidents and the other crimes for which he had been convicted, although he sought to minimize their severity, justify his behavior, or shift the blame for the assaults to the victims. In addition to the evidence that Davis had assaulted Jones on multiple occasions, there was also evidence presented that Jones herself could be violent. Specifically, Davis described an incident in which Jones had intentionally tried to ram his car with her car. According to Davis, A.D. was in the car with Jones when this had occurred. Davis, however, did not report this incident to authorities. Davis refused to characterize his relationship with Jones as violent, although he admitted that it was "unhealthy." Davis also admitted that he had continued placing A.D. in Jones's care despite knowing of her violent behavior, drug abuse, and prostitution. Regarding the prostitution, Davis recalled one occasion in which a man had come to Jones's house seeking prostitution services while A.D. was in the house. Again, Davis did not report this incident to authorities. On another occasion, Davis testified, he had discovered methamphetamine in the baby bag that Jones used when she cared for A.D. Rather than informing law enforcement of this discovery, Davis admitted, he had "flushed [the methamphetamine] down the toilet." On yet another occasion, Davis acknowledged leaving A.D. in the care of his aunt while he went out and sold cocaine. Davis further admitted that he had a history of drug use—including marihuana, cocaine, PCP, and embalming fluid—both before and after A.D.'s birth. At one point during the CPS investigation, the Department requested that Davis submit to a drug test but Davis refused. Tomlinson opined that in her experience, "when parents refuse drug tests in my line of work [it]

15

means that they're using something."[5]  Davis acknowledged that it was not safe for A.D. to be in an environment in which prostitution, domestic violence, and drug abuse occurred.  Davis nevertheless claimed that his parental rights should not be terminated because he had "learned a lot" from his past "mistakes" and that he would change his behavior in the future.

***The parental abilities of the individuals seeking custody; the stability of the home or proposed placement; the programs available to assist these individuals to promote the best interest of the child; and the plans for the child by these individuals or by the agency seeking custody***

At the time of trial, A.D. had been placed with Roberta Thompson and her husband for almost two years.  Brightman testified that it was the Department's plan for A.D. to be adopted by Thompson and her husband, and Tomlinson testified that in her view, this placement afforded the child "some stability in her life."  Prior to caring for A.D., Thompson had experience raising two daughters to adulthood, one of whom is currently serving in the United States Air Force.  Additionally, Thompson testified that she is a licensed foster caregiver and has participated in training classes administered by the licensing agency.  Thompson testified that she wanted to adopt A.D. and provide the child with what the Department characterized as a "forever home."  Thompson did not intend only to care for A.D. on a temporary basis or to give up custody of the child "years later."  Thompson added that her "whole family is excited" about A.D.'s presence in their lives and that "they all love her so much."

---

[5]  In fact, Davis admitted at trial that at the time of the requested drug test, he was under the influence of muscle relaxers that had not been prescribed to him and that he had taken without permission from his mother.

There was some evidence presented from which the jury could have inferred that Thompson's home was not a safe placement for A.D. During cross-examination, Thompson admitted that she had once rented a separate house on her property to a man who in the past had been engaged to marry one of Thompson's daughters and who had subsequently been convicted of a sex offense.[6] However, Thompson testified that she was not aware of the offense at the time the man rented the property from her and that as far as she knew, A.D. was never left alone with the man. Thompson also testified that A.D. was not involved with the criminal investigation or interviewed by CPS in connection with the investigation. Thompson added that the man is no longer living on her property and is currently housed in the Williamson County Jail.

Overall, however, the jury was presented with evidence tending to show that A.D.'s current placement was beneficial to the child's well-being. This evidence included testimony that A.D. had developmental disabilities and that Thompson and her husband had worked with specialists in order to improve the child's abilities. Kara Simon, an early childhood intervention specialist, testified that when A.D. was sixteen months old, she was functioning at the level of a twelve-month-old child with regard to her speech and language. According to Simon, Thompson and her husband had participated in A.D.'s weekly therapy sessions, performed additional assignments with A.D. outside of the sessions, and provided regular reports on the child's progress. Simon observed that within the first six months of working with A.D., the child "really had taken off," had "pretty much caught up" on her development, and "was able to reach all of her developmental goals we

---

[6] The details of the offense are not apparent from the record, although at one point during her testimony Thompson referred to the man as "a convicted rapist."

17

were working on and beyond." Simon attributed A.D.'s progress in large part to "the family's participation" in the therapy and "all of us working together."

In contrast to the amount of time that Thompson and her husband had spent caring for A.D., Davis by his own admission had spent no more than four months caring for the child. Although part of Davis's court-ordered service plan included taking basic-parenting and protective-parenting classes, Davis admitted that he was unable to complete the classes and other aspects of his service plan because of his incarceration.[7] In fact, Davis has been incarcerated for most of A.D.'s life. After his eventual release from prison, which Davis testified could be anywhere from nine to eighteen months following the termination trial, he planned on moving in with his father. David Amboree, Davis's former employer, testified that he would provide Davis with a job upon his release from prison, although it was unclear what that job would be. As Davis acknowledged, "I won't know until I get there."

Davis's parents both testified on their son's behalf. Davis's mother, Kathleen Eason, testified that A.D.'s birth had "changed" Davis and made him a better man. She characterized Davis's relationship with A.D. as "loving and kind." She added, "He was protective, and he took care of her." Eason did not believe that Davis's parental rights should be terminated. She explained, "I think every child ought to be with their mother and father if at all possible, and if that's not possible, I at least think they ought to be able to remain with family." Davis's father, William, testified similarly, claiming that Davis was a "changed" man and that he should be allowed to maintain a relationship with A.D. because "[t]hat's his child."

---

[7] In addition to the parenting classes, these services included counseling, a psychological evaluation, a drug and alcohol assessment, and a domestic-violence intervention program.

In summary, the evidence supporting the jury's best-interest finding included evidence tending to show that: (1) A.D. had bonded with her current caregivers, called them "Mom" and "Dad," and was "thriving" in her current placement; (2) A.D.'s current caregivers provided the child with a loving, stable family and provided for the child's physical and emotional needs; (3) A.D.'s developmental disabilities had improved while she was in their care; (4) the Department believed that termination was in the best interest of the child;[8] (5) in order for A.D. to be adopted by her current caregivers, Davis's parental rights needed to be terminated; (6) A.D. would be able to receive financial and medical benefits as a result of the adoption; (7) Davis had cared for A.D. for no more than four months of the child's life; (8) Davis had an extensive criminal history, including acts of domestic violence committed against the mother of his child and assaults committed against other women; (8) Davis admitted to both using and selling illegal narcotics, including selling cocaine after A.D. was born; (9) Davis had on multiple occasions placed A.D. in the care of her biological mother, a woman who Davis knew had a history of violent behavior, drug abuse, and prostitution; (10) Davis, because of the incarceration that had resulted from his criminal conduct, was unable to complete his court-ordered service plan and had an uncertain future upon his eventual release from prison.

---

[8] Davis argues that the Department's recommendation regarding termination should be discounted because it was based in part on information provided by Megan Pugh, the primary CPS caseworker involved with the case who, according to Brightman, had resigned from the agency after being confronted with "discrepancies" in her documentation of the case. The nature of these discrepancies is unclear from the record, as is the degree to which the Department's recommendation was based on the unspecified discrepancies. We note that Brightman testified that there were other workers involved with the case in addition to Pugh. At any rate, such evidence goes to the weight of the evidence presented, and the jury was entitled to find the Department's evidence credible despite Pugh's resignation. Moreover, the evidence regarding the child's best interest was not limited to the Department's recommendation.

The evidence contrary to the jury's best-interest finding included evidence tending to show that: (1) a sex offender had once lived in a different house but on the same property as A.D.'s current caregivers (but had no known interaction alone with the child and was no longer living there); (2) Davis was A.D.'s biological father, cared for her before he went to prison, and claimed that he would care for her upon his release from prison; (3) Davis's parents believed that Davis was a "changed" man and a good father to A.D. and that termination of his parental rights was not in A.D.'s best interest.

In light of the entire record, and giving due consideration to the evidence that the jury could reasonably have found to be clear and convincing, we cannot conclude that the disputed evidence is so significant that the jury could not have reasonably formed a firm belief or conviction that termination was in the child's best interest. Accordingly, the evidence is factually sufficient to support the best-interest finding. *See In re J.F.C.*, 96 S.W.3d at 266. We overrule Davis's second issue.

## CONCLUSION

We affirm the order of the trial court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed

Filed: February 15, 2012

20