# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-14-00050-CV
---

**B. L. M., Appellant**

**v.**

**J. H. M., III, Appellee**

---
**FROM THE DISTRICT COURT OF BASTROP COUNTY, 423RD JUDICIAL DISTRICT
NO. 423-021, HONORABLE CHRISTOPHER DARROW DUGGAN, JUDGE PRESIDING**
---

### M E M O R A N D U M   O P I N I O N

B.L.M. (Beth) appeals the termination of her parental rights to P.M. and B.M., her two daughters with J.H.M., III (Jack).[1] After a two-day bench trial, the trial court found that Beth had endangered her children and that termination of her parental rights was in their best interest. *See* Tex. Fam. Code §§ 161.001(1)(D)-(E), (2) (termination of parental rights). On appeal, Beth contends in three issues that (1) the trial court improperly took judicial notice of information in the clerk's record and of testimony and exhibits admitted at prior hearings before the court, and (2) the evidence admitted at trial is legally and factually insufficient to support the trial court's endangerment and best-interest findings. We will affirm.

---

[1] We use fictitious names for the parents to protect the privacy of the persons involved and to optimize readability. *See* Tex. Fam. Code § 109.002(d) ("On the motion of the parties or on the court's own motion, the appellate court in its opinion may identify the parties by fictitious names or by their initials only.").

**PROCEDURAL AND FACTUAL BACKGROUND**

Jack and Beth divorced in February 2009.  Although they were initially appointed joint managing conservators of their daughters, possession and access to the children has been altered by court order several times since the divorce.  The proceeding underlying the present appeal originated from a termination petition filed by Jack in May 2012.  At that time, Jack was the girls' sole managing conservator in accordance with a modification order signed by the trial court in January 2012 and Beth was possessory conservator with standard possession.  In seeking to terminate Beth's parental rights, Jack alleged that she had endangered the children's physical or emotional well-being by subjecting them to endangering conduct, conditions, or surroundings.  *See id.* § 161.001(1)(D)-(E).  After a bench trial in December 2013, the trial court agreed and rendered judgment severing the parental relationship between Beth and her daughters.

Between the date of divorce and the termination proceedings, the parties were involved in several court proceedings related to various allegations of misconduct by both parties. At the outset of the termination trial, the trial judge broadly stated that he would take judicial notice of "all the pleadings and evidence in this cause," which the court said included "all the evidence and testimony that has been previously admitted and heard by this Court under my rulings . . . [and] all of the pleadings in this cause dating back to whenever the first pleading was filed."

Neither transcripts of prior hearings nor any exhibits admitted at those hearings were admitted at the termination trial, however, and they are not otherwise a part of the appellate record. Accordingly, the factual and procedural background recounted below is taken from the pleadings and

2

orders in the clerk's record and the testimony and exhibits that were admitted into evidence at the termination hearing.

In Beth and Jack's February 2009 divorce decree, Beth was awarded primary possession of the girls and Jack was awarded standard possession, but both were appointed as their daughters' managing conservators. In July 2009 Beth changed residences, although she continued to live in the same town. According to Jack, Beth did not provide him with her new contact information and, instead, vowed that he would never see the children again. Although Beth has denied making such a statement and has asserted that she gave her contact information to Jack, it is undisputed that Jack had no contact with his children for a significant time following Beth's move. As a result, in December 2009 Jack filed a motion for enforcement of possession and access to the children in which he requested that Beth be ordered to appear in court and be held in contempt for denying him possession and access in accordance with the terms of the divorce decree.

In January 2010 Beth appeared in court pursuant to a court order and alleged for the first time that she had kept the children from Jack because P.M., who was then five years old, had made an outcry of sexual abuse against Jack. Based on Beth's accusation, a child-protective-services investigation ensued, and Jack was criminally charged. In temporary orders issued in March and April 2010, the trial court also determined that possession and access by Jack would endanger the physical and emotional well-being of the children and would not be in their best interest. Accordingly, Jack was denied possession and access, and Beth was appointed temporary sole managing conservator. The trial court found Beth in contempt of court for interfering with Jack's periods of possession and access.

3

The grand jury ultimately declined to indict Jack on the sexual-abuse charge, and in August 2010 the trial court ordered the parties to proceed with a reunification plan under the supervision of a mental-health professional. Pursuant to the court's order, Jack engaged in counseling with P.M. and in January 2011 began having supervised visitation with both children. At that point, Jack had had no contact or visitation with his children for nearly 18 months, and they had missed both time with him and time with their extended paternal family as a result of the sexual-abuse allegations. It is undisputed that Jack complied with all therapy required for reunification, attended all supervised visits, and paid for all services without assistance from Beth. Nevertheless, the reunification process did not proceed smoothly, in part because Beth continued to profess a belief that Jack had abused P.M. and that everyone involved in the system was failing in their duty to protect her children.

According to a motion for contempt Jack filed in August 2011, Beth had acted inappropriately in a number of ways that were harmful to the children and that violated the trial court's orders. On September 15, 2011, the trial court issued a contempt order in which the court found, based on incidents that occurred in July 2011, that Beth had committed 15 violations of two court orders. Those incidents, as found by the court, can be summarized as follows:

- Beth was involved in a domestic disturbance with her partner on July 19, 2011, when the girls were in her possession. The disturbance escalated to the point that a law-enforcement officer was dispatched to Beth's home.

- On July 21, 2011, Beth showed up at one of Jack and P.M.'s therapy sessions, even though she was not supposed to be present. At that time, she used vulgar, profane, or indecent language or a coarse or offensive manner to

4

communicate with Jack, and she made disparaging remarks about him in P.M.'s presence.

- On July 28, 2011, Beth cancelled a scheduled therapy session Jack and P.M. were to have as part of a court-ordered reunification plan, which was being administered by a third-party mental-health professional.

- On July 30, 2011, Beth approached Jack after he left a supervised visit with the children and disturbed the peace such that law enforcement was called by an unknown bystander; Beth used vulgar, profane, or indecent language or a coarse or offensive manner to communicate with Jack at that time; and she threatened to take "unlawful action" against him, the children, court-appointed professionals, and the court.

- On July 30, 2011, Beth placed one or more telephone calls to Jack, at an unreasonable hour, in an offensive or repetitious manner, without a legitimate purpose or anonymously.

- On July 30, 2011, Beth brought the children to Jack's house near midnight and disturbed the children's and Jack's peace; at that time, she used vulgar, profane, or indecent language or a coarse or offensive manner to communicate with Jack; she threatened to take "unlawful action" against Jack and made disparaging remarks about Jack and his family in front of the children.

- Sometime before July 30, 2011, Beth or those acting in concert with her made disparaging remarks about Jack within the children's hearing to the effect that Jack was not "washed in the blood of Jesus."

There is no transcript from the contempt hearing in the appellate record, but the following is a summary of testimony Jack provided at the termination trial about some of the incidents that had occurred in the summer of 2011:

- In June 2011 Beth did not bring P.M. to a scheduled therapy appointment;

- In July 2011 Beth came to a therapy session scheduled for Jack and P.M. when she was not supposed to be there. During the session, she became

5

belligerent, used foul language, and upset the therapeutic session. P.M. was present for the entire incident, and the therapist had to ask Beth to leave.

- After another therapy session, Beth confronted Jack outside the therapist's office. She was "aggravated, very confrontational," and pulled some of his chest hair out. Beth also said Jack was probably not B.M.'s father. Jack does not know if the children witnessed this interaction but assumes they did because they were in a nearby car.

- During a supervised visit, P.M. and B.M. informed Jack that their maternal grandmother had told them he was not washed in the blood of Jesus.

- In July 2011 Beth confronted Jack after a supervised visit. She intercepted him through an exit all parties knew only he was to use in order to avoid confrontations. Beth told Jack she wanted him to talk to P.M., but he refused because he was under a court order not to talk to P.M. without supervision. Beth became belligerent, and an unknown bystander called law enforcement. Later that evening, Beth called Jack at least twice, asking that he meet her at Walmart so he could talk to P.M. Because Jack again refused, Beth brought the girls to his house around midnight and stayed outside for approximately 45 minutes. The girls were scared and crying the entire time, but Jack could not open the door due to the court-ordered-supervision requirement. Law enforcement responded at Jack's request.

Beth also testified at the termination trial about these incidents. She denied many of the allegations, generally disputing Jack's version of events or offering an explanation or a different version of the events. For example, Beth conceded that she had missed one of P.M.'s therapy appointments but asserted that it was due to car trouble. She further acknowledged coming uninvited to one of Jack and P.M.'s therapy sessions but denied behaving inappropriately. She testified that Jack was lying about her behavior. Although she admitted that a bystander called police following one visitation exchange, she testified that she does not recall any incident in which she "accost[ed]" Jack and cursed at him in front of the children or ripped his chest hair out. She specifically denied ever having claimed that B.M. was not his daughter. With regard to the events on the night she took

6

the children to Jack's house, she testified that she called Jack only because he had asked her to. She denied demanding that he come to Walmart, but admitted that she took the children to his house at around 10:00 p.m. and stayed for 30-45 minutes. She asserted that they were not scared or crying, other than a brief time when B.M. cried because a barking dog scared her. She acknowledged, however, that it was not a good idea for the children to be out at that time of night for that length of time and that her conduct directly violated the trial court's orders.

Beth also acknowledged that law enforcement responded to a "possible" domestic disturbance involving her and her partner, Kim, in July 2011. A police report regarding this incident was admitted at trial without objection. The report stated that Kim had reported that the dispute was verbal and that Beth had reported no physical contact by either party. The report further stated that there were no signs of a physical altercation. Although Beth acknowledged that it was not good for her children to be exposed to law enforcement and admitted that it had happened around the girls "a few times," she testified that the girls were not present during this incident.

Shortly after the contempt hearing but before the trial court ruled on the contempt motion, P.M. and B.M. were in the care of their maternal grandparents and were visiting their mother for P.M.'s birthday, which was on September 8, 2011. Evidence was presented at the termination trial that a domestic dispute occurred between Beth and Kim after the children arrived at their home. Beth was the only witness with personal knowledge of the event who testified at trial. She testified that law enforcement responded to the domestic disturbance and that she was arrested for "assault family

violence." She further testified, however, that her parents removed her daughters from the home as soon as voices escalated and that the children were not present for the ensuing argument or law-enforcement intervention.

In addition to Beth's testimony, the affidavit for probable cause to arrest her for the incident was admitted into evidence without objection. The affidavit recounts that Kim had alleged that, in the girls' presence, Beth yelled and screamed at her for giving gifts to the children and then threw the gifts away. According to the affidavit, Kim had further reported that the children were removed by family members and the arguing continued. Kim alleged that the situation had thereafter escalated into a physical altercation in which Beth had twice slapped her in the face, spat in her face, threatened to kill her with a frying pan, and then threw the frying pan at her, striking her in the lower back and causing a minor injury. When questioned about the incident at the termination trial, Beth denied she threw away gifts that Kim had given to the girls. She further testified that the criminal charge was dismissed after she voluntarily participated in an anger-management course.

Although not present during the alleged altercation, Barbara Buie, a private-practice therapist who had been treating one or both of the children since December 2010, testified at the termination hearing that the children had acted out the violence alleged to have occurred against Kim in multiple play-therapy sessions. Buie stated that the girls' actions suggested that they may have witnessed the assault, but she further indicated that it was not clear that they had actually been present.

On September 15, 2011, the trial court entered an order finding Beth in contempt of court and imposing consecutive six-month jail sentences for each of the 15 violations. The court,

8

however, capped the amount of jail time at 18 months total, suspended the sentence, and placed Beth on community supervision for a period of one year.[2]

Contemporaneously with the September 15, 2011 contempt order, the trial court issued temporary orders appointing Beth and Jack as temporary joint managing conservators but found it was not in the children's best interest for them to live with Beth. Although not signed until September 15, 2011, this order was based on a hearing that had occurred in August 2011. Under this order, the children were to be immediately removed from their mother's home, placed in the care of their maternal grandparents, and transitioned to their paternal grandparents' care, with the ultimate goal of reunification with their father under the therapeutically directed reunification plan.

Also on September 15, 2011, the trial court issued another temporary order based on a hearing that had occurred the same day. In that order, the court appointed Jack as the girls' temporary sole managing conservator and Beth as temporary possessory conservator. The order included a finding that it was not in the children's best interest to have unsupervised contact with Beth. The order specified that the children would be placed with their maternal grandparents subject to the reunification-plan transition schedule. Under the terms of this order, Beth's visits with the children were to be supervised either by her parents or by a mental-health professional.

---

[2] As conditions of community supervision, the September 15, 2011 contempt order required Beth "to comply with all orders of this Court and to cooperate fully with Dr. Christopher A. Brown [who was administering the reunification plan] and any other professionals working with Dr. Brown." The trial court signed a nearly identical contempt order on January 10, 2012, which included the same violations and sentence. The only apparent difference between the orders is that the terms of community supervision in the latter order were limited to compliance with the trial court's orders.

In October 2011 the girls began living with Jack and his parents in accordance with the trial court's temporary orders and the court-ordered reunification schedule.

In December 2011 the trial court conducted a bench trial on a petition Jack had filed to modify Beth's possession and access to the girls,[3] and on January 10, 2012, the court issued an order granting the modification request. In the modification order, Jack was appointed sole managing conservator and granted the exclusive right to designate the children's primary residence. Beth was appointed possessory conservator with immediate standard possession. The court found, however, that Beth had a history or pattern of child neglect and, as a result, required that her visits with the children be supervised by their maternal grandparents until she completed mental-health treatment and filed a certificate of completion. It appears that this condition may have been satisfied when Beth filed a certificate that she had completed a "Women's Adult Violence Intervention Program" on February 1, 2012.

Nonetheless, there continued to be issues between Beth and Jack with respect to the children. In particular, there is evidence that Beth continued to harbor a belief that Jack had sexually assaulted P.M. and that the system was failing her children. Consistent with that belief, Beth admitted that in April 2012 she created a blog in which she asserted that her children were living with two sexual-abuse perpetrators (Jack and his father) and complained that she had been prohibited by the court from talking about the alleged abuse.

_____

[3] The modification petition is not included in the record; consequently, neither the grounds nor the time of filing is apparent from the record.

Jack testified that, around the same time, Beth was belligerent during a visitation exchange in a Walmart parking lot and began pounding on his car windows as he tried to drive away and as the children, who were in an adjacent vehicle, looked on. He maintained that he had done nothing to provoke this confrontation or any other confrontations with Beth. Beth testified that she had no recollection of the alleged confrontation and said very few exchanges had occurred at Walmart. She stated that Jack's testimony was his interpretation of events, and her interpretation was that she never had an altercation with him in a Walmart parking lot.

On May 14, 2012, Jack filed a petition seeking to terminate Beth's parental rights on the grounds that she had endangered the children's physical or emotional well-being by subjecting them to endangering conduct, conditions, or surroundings. *See id.* §161.001(1)(D)-(E). The petition was later amended to include alternative requests to either deny Beth access to the children or require supervised visitation. The incident precipitating the termination filing occurred the day before, on Mother's Day, during Beth's scheduled visitation with the children. It is undisputed that Beth took the girls to the hospital on that day, alleging that B.M. had made an outcry of sexual abuse against Jack. B.M. was subjected to a sexual-abuse examination, and an investigation against Jack ensued. Beth maintained at the time and during the termination trial that B.M. had made the outcry on Mother's Day and that she had immediately responded by taking the children to the hospital.

Stacy Helms, the clinical director for the Children's Advocacy Center, contradicted Beth's claim regarding the timing of B.M.'s alleged outcry, the implication being that Beth had concocted a plan to make sexual-abuse allegations against Jack before her Mother's Day visitation. Helms testified that Beth had contacted her six days before Mother's Day, complaining that Jack was

11

now abusing B.M. Beth reported to her that the authorities were involved, and Helms informed Beth that there was nothing more Helms could do at that point. Helms stated that this was her last contact with Beth. Although Helms believed that Beth was upset, hurt, and only wanting the best for her children, Helms testified that, based on the information she had in the spring of 2012, Beth could not be a consistent, predictable, and reliable parent at that time. Accordingly, Helms encouraged Beth to continue services and referred her to someone who could provide a treatment plan.

Helms admitted that, in earlier trial-court proceedings, she had recommended that it would not be in P.M.'s best interest to have contact with Jack because P.M. had exhibited "red flags or behavioral markers consistent with [the] alleged abuse." She stated that her recommendation against contact with Jack was based on "information and observations and self-reports" available to her at that time. During her treatment of Beth, however, Helms had come to question the reliability of Beth's "self-reports" and the way she acted outside of therapy. Helms found that Beth was self-destructive, impulsive, and unwilling to accept responsibility for her actions, and also tended to blame others for everything. Helms stated that, from the information available to her in the spring of 2012, she no longer had any reason to question Jack's ability to adequately care for the children.

At the termination trial, a county sheriff's investigator testified that the May 2012 sexual-abuse complaint could not be verified. According to a physical examination, there was no trauma to B.M.'s vaginal area and no other evidence of sexual abuse. In addition, B.M. and P.M. were subjected to forensic interviews, and B.M. did not make an outcry to the forensic interviewer. The investigator further explained that the girls had been subjected to too many outside influences

as the case had evolved over the years, making it difficult to prove whether anything had happened. Accordingly, no criminal charges were filed against Jack.

In September 2012 the parties agreed that Beth's visits with the girls would be supervised by a neutral third-party, Betty Lou Gaines. According to the parties' agreement, the visitations would be supervised for a six-month period and would initially last for two hours on the Saturdays of the standard possession order, but they could be increased if recommended by Gaines and Buie, the children's therapist. This agreement was formalized in a temporary order issued on November 7, 2012. Sometime in between these events, P.M. recanted her original allegations of sexual abuse. From that point in time, it appears from the record that Beth was generally able to move forward in a positive direction with the children and with Jack. At the termination trial, Beth testified that she no longer believed that Jack had abused her daughters or that there was a systemic failure to protect her children, although she had struggled with that revelation even after P.M. recanted.

Once supervised visitation began in November 2012, Beth missed the first few visits, but she explained that she had been confused about the interpretation of the visitation schedule in the court's order. According to Jack, the girls were disappointed and confused when Beth missed scheduled visits. Buie reported that P.M. was very sad and confused about missing visits with her mother. Once the initial scheduling issues were addressed, however, there is no evidence of any issue related to Beth's visits with the girls since December 2012.

A little more than a year later, in December 2013, the case proceeded to trial on Jack's termination petition. The trial testimony included evidence of all the prior alleged incidents as well

13

as a few other instances in 2011 in which Beth had not taken the children to therapy sessions. Although disputing salient aspects of Jack's version of some events and offering explanations for others, Beth admitted that she had been "labeled with parental alienation syndrome" in the past. Several witnesses also testified about Beth's behavior over the years and how it had adversely affected—and continued to adversely affect—the girls' psychological and emotional well-being. There was also testimony from the children's teachers, therapists, and health-care providers that the children appeared to be doing well in Jack's care, although P.M. had been struggling socially and academically since the beginning of the school year due to "focus" issues. Jack likewise testified that the girls had been doing very well in school since he obtained custody, but he observed that their school work had slipped over the past few months. He attributed the performance issues to the girls' spending more time with Beth as she worked up to unsupervised and overnight visits with them. Although it is unclear how much supervised visitation Beth had with the girls in the preceding year, the record reflects that she had at least two unsupervised overnight visits with P.M.—one in November 2013 and one in December 2013—and one two-hour unsupervised visit with B.M. in December 2013, all of which occurred without apparent incident.

Despite evidence of considerable past issues with Beth, it was essentially undisputed that there had been no significant concerns in the 12-month period preceding the trial. In fact, Jack testified that Beth had been "on her best behavior" and that leading up to the trial he had concluded that it might not be in the girls' best interest to terminate Beth's parental rights. Gaines also testified that she had seen significant improvement and change in Beth in the preceding 12-month period, to the point that she had anticipated recommending at the termination hearing that the parents be

awarded equal custody. Gaines noted that Beth had even asked her to stay involved in the case for six to eight months after trial, which Gaines believed was a positive indicator that Beth was capable of changing and had, in fact, changed.

Although Buie provided extensive testimony about the lingering emotional effects that Beth's prior conduct had on the girls, she also testified that she had no knowledge of any inappropriate actions by Beth in the year before trial.[4] With regard to some of the earlier actions, Buie believed that Beth genuinely believed her children were being abused, but she stated that Beth had behaved inappropriately in response. Assuming Beth had acted in all the ways Jack had alleged—some of which she had heard about previously and some she had not—Buie testified that the alleged conduct would be detrimental to the children's mental and emotional well-being. She further testified that, even though things had been going well for some time, B.M. still did not feel completely safe with Beth, which was partly related to the sexual-abuse examination and investigation; P.M. feared that Beth did not want her to have a relationship with Jack; both kids were concerned that they would have to live with Beth if something happened to Jack; both worried that Beth would harm Jack or Kim; and both worried that things could go back to the way they used to be. In general, the girls had expressed to Buie, both verbally and in play therapy, that they were somewhat anxious about spending time with Beth. Nevertheless, Buie testified that the children are

---

[4] Buie noted that her information about visits came both from her discussions with Gaines and her therapy sessions with the girls. Although acknowledging the absence of any apparent concerns with the unsupervised visits, Buie stated that she suspected Beth may have coached P.M. to ask for more unsupervised time following their first overnight visit. According to Buie, P.M.'s request sounded too mature and she had expressed concern that Beth would be upset that Buie would not recommend an overnight visit during the Thanksgiving weekend.

15

very connected to Beth, want a relationship with her, and want to spend time with her. According to Buie, P.M. had professed a desire to live with her father during the week but with her mother on the weekends; B.M. had been more contradictory in expressing her wishes, stating both that she preferred visitations to be supervised by Gaines and that she wanted unsupervised time and overnight visits with her mother. Buie also observed that both girls, especially B.M., are bonded to Beth's partner.

Regrettably, about a week before the termination trial, Beth was arrested for felony possession of methamphetamine on the eve of her first unsupervised visit with B.M. and second overnight visit with P.M. Although Beth had bonded out of jail shortly before Gaines delivered the girls to Beth for their scheduled visits, Beth did not disclose her arrest to Gaines at that time and instead lied, saying that she had worked all night. Members of Beth's family, who were also present, likewise remained silent regarding Beth's arrest. As there was no indication of any issue, Gaines allowed Beth to spend unsupervised time with the girls, as scheduled.

Beth was the only witness with personal knowledge of the arrest who testified at trial. According to her testimony, she was a passenger in the vehicle of a friend whom she had not seen in some time; she was not in possession of any drugs or drug paraphernalia; she did not know where the alleged drugs were found; and she was charged with a third-degree felony for possession of methamphetamine. There was no other evidence concerning the circumstances of Beth's arrest. Although Jack testified that it would not "surprise" him if Beth had been arrested for methamphetamine possession based on his knowledge of her and her conduct over the past 9-10 years, there was no evidence of any prior or current drug use by Beth. Although Beth testified that she had already taken a drug test, neither the results nor timing of the test were disclosed or

16

discussed at trial. At most, there was evidence that Beth had been arrested and charged with felony possession of methamphetamine and that she had lost approximately 20 pounds in the past 12-18 months, which could arguably be consistent with chronic drug use. Beth, however, explained that her weight loss was the result of eating less, taking on a more physically demanding job, and being emotionally taxed by the loss of a close relative.

In light of the pending criminal charges, which he learned about the day before the trial, Jack testified that he had come to believe that termination of Beth's parental rights would be in the girls' best interest, even though it would be hard on them not to have their mother in their lives.[5] Jack further testified that he was very concerned about the arrest and was scared that an overnight visit had occurred on the same day Beth bonded out of jail. Jack's mother likewise testified that Beth's parental rights should be terminated; in her opinion, the children had been emotionally abused for years, and it would not be in their best interest to continue any sort of relationship with Beth.

---

[5] Jack testified as follows:

Q: [Jack], have the last two years been good for your girls?
A: Yes.
Q: Did there even—can you tell the Court whether or not there came a time in this process where you had decided that maybe termination wasn't the best thing for them?
A: Yes.
Q: Do you feel that way as we sit here today?
A: No.
Q: Can you tell us why?
A: Because the actions that I've become aware of.
Q: Are you aware that [Beth] was arrested Friday night?
A: Yes.
Q: When did you learn of that?
A: Yesterday.

Beth denied using or possessing any drugs, but she apologized for her past actions, for the pain she had caused Jack and his family, and for the impact of her actions on P.M. and B.M. Beth testified that Jack had done a good job with the kids since he had obtained primary custody and stated that she believes the children are safe living with him. She maintained, however, that awarding her equal possession and access would be in the girls' best interest.

Gaines testified that she had no knowledge of the circumstances of Beth's arrest but could not recommend unsupervised visitation until the pending criminal case was resolved or more information was known about Beth's possible drug use. Gaines expressed deep concern that Beth had not promptly informed her about the arrest and stated that the recent arrest made her unsure how to view her experience with Beth during the preceding year and a half; however, in that time she never saw anything that led her to believe that Beth was using methamphetamine. Moreover, Gaines never had a concern during visitation that Beth was behaving inappropriately or that the children were afraid of Beth or in danger in her care. Even if Beth had been abusing drugs, Gaines opined that (1) Beth's parental rights should "absolutely not" be terminated, (2) any concerns raised by the drug-possession arrest would be better addressed by requiring that Beth's visitations with the girls be supervised, and (3) she had no concerns about Beth's having supervised visits with the children. According to Gaines, unsupervised visitation was a concern only because of the pending drug charge and the questions raised by the arrest.

Gaines admitted, however, that her recommendation was based only on what she knew about Beth's past conduct, which included knowledge of most of the allegations against Beth. She stated that her recommendation "might change" if some of the allegations against Beth that she had

18

not heard before were true, including that Beth (1) had videotaped P.M. on several occasions in the past, interrogating her about therapy, interactions with Jack, and questions the police might have, (2) cooked up a plan to falsely accuse Jack of sexual abuse in May 2012, and (3) brainwashed P.M. into making an abuse allegation. Gaines was neither asked nor offered how her recommendation might change based on evidence of these events, which predated her involvement in the case. She ultimately testified, however, that despite the stories of Beth's past bad acts, her recommendation remained the same because she believed people could change, she had directly witnessed considerable positive changes in Beth in the preceding year and a half, Beth had made overtures to co-parent with Jack even though it was difficult for her, and Beth had regularly asked for advice and coaching for better ways to handle various situations with the girls. In the end, Gaines stated that the only thing that caused her to question Beth's contact with the kids was her recent drug arrest.

In Buie's opinion, it would not be safe for the children to live with Beth given the recent drug charges, and if visitation were allowed, supervised visitation would be appropriate at this time. Although Buie did not expressly offer an opinion about whether termination would be in the girls' best interest, she stated that terminating parental rights is generally not in a child's best interest. In addition, Gaines was permitted to testify without objection that Buie had communicated to her that she felt Beth's parental rights should not be terminated.

After hearing evidence and taking the matter under advisement, the trial court issued an order terminating Beth's parental rights based on findings that she had endangered the children's physical or emotional well-being by subjecting them to endangering conduct, conditions, or surroundings and that termination of her parental rights was in the children's best interest. *See id.*

19

§161.001(1)(D)-(E), (2). The trial court expressly found that Beth had (1) intentionally and knowingly given false testimony before the court and was not credible, (2) committed family violence during the pendency of the cause and that there was a substantial likelihood of recurrence,[6] and (3) intentionally and knowingly committed the felony offense of methamphetamine possession on the night before a scheduled visitation with the children and within one week of the termination trial.[7]

In three issues on appeal, Beth challenges the breadth of the information of which the trial court took judicial notice and the legal and factual sufficiency of the evidence to support the trial court's endangerment and best-interest findings.

## DISCUSSION

In appellate issue one, Beth complains that the trial court improperly took judicial notice of prior testimony, evidence, and factual assertions from earlier hearings and from the court's

---

[6] The evidence of family violence admitted at trial related to incidents that predated Jack's filing of the petition to terminate Beth's parental rights. Accordingly, we presume this finding is based on those events or evidence from other proceedings that the trial court judicially noticed.

[7] The evidence supporting this finding includes (1) Beth's admission that she was arrested for the offense, (2) any adverse inference that might be drawn from the fact that she asserted her Fifth Amendment right against self-incrimination in declining to answer whether she took "any responsibility for the arrest," (3) any adverse inference that could be drawn from the trial court's finding that Beth is not credible, and (4) the fact that Beth had lost approximately 20 pounds in the previous 12-18 months. *See, e.g.*, *In re C.J.F.*, 134 S.W.3d 343, 352 (Tex. App.—Amarillo 2003, pet. denied) (stating that jury could draw adverse inference against parent in termination case who pleaded the Fifth Amendment to questions about drug use and actions on the day of child's death); *see also Baxter v. Palmigiano*, 425 U.S. 308 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."). Otherwise, Beth expressly denied using illegal drugs and committing the alleged offense, and there is no other evidence concerning these matters.

20

files that were not offered and admitted into evidence at the termination trial.[8] Beth contends that any factual assertions in these records are not adjudicative facts that could be judicially noticed and that, as a result, Jack bore the burden of bringing forth admissible evidence to establish all facts relevant to his theory of the case.

An adjudicative fact may be judicially noticed only if it is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Tex. R. Evid. 201. Although a judge may have personal knowledge of a fact, that does not mean the fact may be judicially noticed. *Guyton v. Monteau*, 332 S.W.3d 687, 692-93 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (citing *Wilson v. State*, 677 S.W.2d 518, 524 (Tex. Crim. App. 1984)). A court may take judicial notice of the existence of pleadings and other documents that have been filed in a case, but the court cannot take judicial notice of the truth of allegations in those documents unless they have been admitted into evidence. *Id.* at 693; *see also In re C.A.N.M.*, No. 02-04-00200-CV, 2005 WL 1356443, at *3 (Tex. App.—Fort Worth June 9, 2005,

---

[8] The following trial-court fact finding reflects that there were several evidentiary and non-evidentiary hearings in this case before the termination hearing:

> This Court conducted numerous evidentiary and non-evidentiary hearings (Motions to Modify, Motions for Enforcement, Temporary Orders hearings, Review hearings, and Status hearing[,] etc.) on this Cause including on or about January 4, 2010, January 22, 2010; February 4, 2010; March 4, 2010; March 10, 2010; June 7, 2010; August 10, 2010; February 3, 2011; April 19, 2011; April 20, 2011; August 24, 2011; August 26, 2011; September 15, 2011; November 2, 2011; December 19, 2011; May 17, 2012; June 7, 2012; July 12, 2012; August 24, 2012; September 6, 2012; November 29, 2012; February 21, 2013; September 18, 2013, November 6, 2013.

no pet.) (mem. op.); *Barnard v. Barnard*, 133 S.W.3d 782, 789 (Tex. App.—Fort Worth 2004, pet.

denied); *Tschirhart v. Tschirhart*, 876 S.W.2d 507, 508-09 (Tex. App.—Austin 1994, no writ). It is

likewise "inappropriate for a trial judge to take judicial notice of testimony even in a retrial of the

same case." *Guyton*, 332 S.W.3d at 693 (citing *Muller v. Leyendecker*, 697 S.W.2d 668, 675 (Tex.

App.—San Antonio 1985, writ ref'd n.r.e.), and *Garza v. State*, 996 S.W.2d 276, 280 (Tex.

App.—Dallas 1999, pet. ref'd)). "In order for testimony from a prior hearing or trial to be considered

in a subsequent proceeding, the transcript of that testimony must be properly authenticated and

entered into evidence." *Id.*; *see also In re M.C.G.*, 329 S.W.3d 674, 675 (Tex. App.—Houston

[14th Dist.] 2010, pet. denied) (supp. op. on reh'g); *In re C.L.*, 304 S.W.3d 512, 514-16 (Tex.

App.—Waco 2009, no pet.); *Garza v. State*, 996 S.W.2d at 280; *Escamilla v. Estate of Escamilla*,

921 S.W.2d 723, 726 (Tex. App.—Corpus Christi 1996, writ denied). In examining the proper scope

of judicial review, the Waco Court of Appeals recently explained:

> A trial court may generally take judicial notice of its own records in a case involving the same subject matter between the same or practically the same parties.
>
> However, testimony from a previous trial cannot be considered by the trial judge at a subsequent trial unless it is admitted into evidence at the subsequent proceeding.
>
> The trial judge's own memory of what the witness may have said at the prior proceeding is insufficient to substitute for an accurate and properly authenticated record of that testimony. A fact is not capable of accurate and ready confirmation simply because a trial judge remembers that a witness testified to it in trial. While a court may take judicial notice of the existence of the testimony in [a related] trial, as the trial court did in this case, a court may not take judicial notice of the truth of the factual content of that testimony because its accuracy can reasonably be questioned.
>
> A trial judge may not even judicially notice testimony that was given at a temporary hearing in a family law case at a subsequent hearing in the same cause without admitting the prior testimony into evidence. Further, while a court may judicially

22

> notice the existence of an affidavit in its file, it may not take judicial notice of the truth of the factual contents contained therein.
>
> Accordingly, in order for testimony at a prior hearing or trial to be considered at a subsequent proceeding, the transcript of such testimony must be properly authenticated and entered into evidence.

*Davis v. State*, 293 S.W.3d 794, 797-98 (Tex. App.—Waco 2009, no pet.) (citations omitted).

In accordance with these well-established principles, we agree with Beth that the trial court erred in taking judicial notice of evidence that was not notorious or verifiable and that was not admitted into evidence at the termination trial. The fact that the proceeding below was a bench trial rather than a jury trial does not alter our conclusion. *See In re C.L.*, 304 S.W.3d at 516 (stating that court was "unaware of any authority" supporting proposition that different judicial notice rules apply in bench trials and noting that "all but one of the cases cited in this opinion on judicial notice arose from non-jury proceedings").

Jack contends that Beth waived the alleged error regarding judicial notice because she failed to make a timely, specific objection in the trial court. When the trial court first stated that it was taking judicial notice, Beth's counsel objected only to the court's "taking judicial notice of anything before the January 10th, 2012 . . . final order that this modification is filed on." This objection was presumably based on section 156.101 of the Family Code, which authorizes a trial court to modify a prior order appointing a child's conservator or governing possession of and access to a child only if there has been a material and substantial change of circumstance since the date the order to be modified was rendered. *See* Tex. Fam. Code § 156.101. The trial court overruled the objection.

Before the close of evidence, however, Beth's counsel renewed that objection, explained the scope of the objection, and expanded the objection as follows:

> I don't object to Your Honor taking judicial notice of the orders that have been in this case. I am objecting to Your Honor taking judicial notice of the entire file and the other evidence. I think it could be based on hearsay. I don't know if all the transcripts are in there. I don't know what's in the file that may be something other than orders. And I'd like to renew my objection and request the Court not consider anything in the file that could be hearsay, that could contain items that res judicata[] may have attached to, or that testimony, or whatnot, that we don't have the official transcripts in the file.

The trial court again overruled the objection. We conclude that this latter objection was specific enough to apprise the court of the complaint and timely enough to allow Jack to introduce any additional evidence or testimony or seek a continuance to do so. Given the constitutional magnitude of the rights at stake in this case, we hold that Beth sufficiently presented the objection to the trial court and thus preserved it for appellate review. We therefore sustain appellate issue one.[9]

In appellate issues two and three, Beth challenges the legal and factual sufficiency of the evidence supporting the trial court's endangerment and best-interest findings. Although the trial court expressly took judicial notice of testimony and evidence admitted at prior hearings—and to the extent the court took judicial notice of factual assertions in documents filed with the court—that is

---

[9] Jack also suggests that any error in taking judicial notice is harmless because the judicially noticed evidence is merely cumulative of properly admitted evidence. Because the prior hearing transcripts and exhibits are not part of the appellate record, we have no way of assessing the accuracy of Jack's assertion, but we note that there are at least some documents in the court's files—for example, therapists' notes and reports—that include factual assertions that are not cumulative of the evidence admitted at trial. None of this evidence can be considered in reviewing the legal and factual sufficiency of the evidence to support the judgment.

24

not evidence we can consider as part of an evidence-sufficiency review. *See Guyton*, 332 S.W.3d at 693 ("When evidence is the subject of improper judicial notice, it amounts to no evidence."); *Barnard*, 133 S.W.3d at 789 ("A trial judge is presumed to consider only the testimony and exhibits properly in evidence."). Rather, "we are limited to considering the material that was before the trial court at the time that it ruled . . . [and] documents not admitted into evidence are not considered by an appellate court." *Barnard*, 133 S.W.3d at 789 (citations omitted). Accordingly, our evidence-sufficiency review is limited to the evidence admitted at the termination trial and properly noticed contents of the clerk's record.

To terminate the parent-child relationship, there must be clear and convincing evidence that the parent committed one or more of the acts specifically set forth in Family Code section 161.001(1) and that termination is in the children's best interest. *See* Tex. Fam. Code §§ 161.001(1), (2), .206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007. Due process demands this heightened standard because of the fundamental interests at issue. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).

In this case, the trial court found clear and convincing evidence that Beth (1) knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, a violation of section 161.001(1)(D) of the Family Code, and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being, a violation of section 161.001(1)(E) of

25

the Family Code. *See* Tex. Fam. Code § 161.001(1)(D)-(E). The trial court also found that termination of the parent-child relationship was in the children's best interest. *Id.* § 161.001(2).

Only one ground under section 161.001(1) is necessary to support a judgment in a parental-rights termination case. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Therefore, when termination is based on multiple grounds under section 161.001(1), as it was here, we must affirm the termination order if the evidence is sufficient to support any one of the grounds found by the district court and the best-interest finding. *Id.*

Both subsections (D) and (E) of section 161.001(1) require proof of endangerment, which means exposing a child to loss or injury or jeopardizing a child's emotional or physical health. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). With respect to subsection (E), the endangerment must be the direct result of the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission. *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). Subsection (D), on the other hand, permits termination based on a single act or omission. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Although an endangerment finding requires more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury; rather, it is sufficient if the conduct endangers the emotional well-being of the child. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *Boyd*, 727 S.W.2d at 533. Additionally, "[d]omestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*,

26

99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). As a general principle, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

In evaluating the legal sufficiency of the evidence in a case involving termination of parental rights, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was established. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (citing *In re J.F.C.*, 96 S.W.3d at 264-66). We review all the evidence in the light most favorable to the finding and judgment. *Id*. We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so and disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* However, we must consider undisputed evidence even if it is contrary to the finding. *Id*. That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id*.

In reviewing the factual sufficiency of the evidence, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. We are required to consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. *Id*. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*.

In assessing the sufficiency of the evidence under the foregoing standards, we cannot weigh witness-credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's exclusive province. Instead, we defer to the factfinder's credibility determinations as long as they are not unreasonable. *In re J.P.B.*, 180 S.W.3d at 573-74.

In appellate issue two, Beth challenges the legal and factual sufficiency of the evidence to support the grounds for termination found by the trial court. The record includes evidence that Beth had, at least up until 12-15 months before trial, engaged in acts of domestic violence, lacked self-control, and demonstrated a propensity for violence over a number of years. Although disputed or minimized by Beth, there is evidence in the record of a number of incidents in which Beth had engaged in domestic violence or displayed a propensity for violence, both with Kim and with Jack. The trial court was entitled to credit this evidence and to discount Beth's version of events. Gaines and Buie testified that the alleged acts of domestic violence, if found to have occurred, would endanger the children's emotional well-being even if the children did not witness the events. Furthermore, there is evidence that Beth intentionally secreted the children from Jack for an extended period of time and sufficient evidence to support an inference that she fabricated or coerced the children into making false allegations of sexual abuse on more than one occasion. As a result of the sexual-abuse allegations, the children were subjected to invasive medical examinations and questioning by law-enforcement and child-protection authorities, and they were denied visitation with their father and extended paternal family for a substantial period of time, which was not in their best interest. Both Buie and Gaines testified that brainwashing a child into making a sexual-abuse

28

allegation would be extremely detrimental to the child's emotional well-being and would be second only to actual sexual abuse in the harm it could produce.

Buie further testified that P.M. and B.M. were harmed by Beth's past conduct and continued to suffer the ill effects of that conduct. Moreover, there is significant evidence that, due to Beth's conscious course of conduct, the children have been subjected to uncertainty and instability in their relationships with their parents and extended family, which has also endangered their emotional well-being. Although there is undisputed evidence that Beth made substantial improvements on a number of fronts in the year preceding the termination trial, the trial court was free to determine that any recent improvements that occurred in the structure of a supervised environment did not negate her past behavior. *See, e.g.*, *In re J.O.A.*, 283 S.W.3d at 346 ("While the recent improvements made by [father] are significant, evidence of improved conduct, especially of short duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices.").

Beth also suggests that events predating the January 10, 2012 modification order are not relevant because the trial court found at that time that awarding her standard possession was appropriate and would be in the children's best interest, thus barring any conclusion that her conduct before that date is relevant to establishing grounds for terminating her parental rights. *Cf.* Tex. Fam. Code § 156.101(a)(1)(A) (possession or conservatorship may be modified if in child's best interest and material and substantial change in circumstances has occurred since prior order). Although Beth cites no authority for this proposition, even if it were otherwise reasonable, there were significant circumstances that occurred after that date—in particular the confrontation that occurred at the

29

Walmart parking lot in April 2012 and the sexual-abuse allegations in May 2012—from which the trial court could have concluded that Beth continued to endanger and pose a further risk of endangering the children with her unstable, volatile, and emotionally abusive behavior. These circumstances are of the same type as Beth's past misconduct, and whether viewed in isolation or as part of a continuing course of conduct, the trial court could reasonably have concluded that they rose to the level of endangering conduct that supported termination of Beth's parental rights. *Cf. Wilson v. Elliott*, 73 S.W. 946, 947 (Tex. 1903) (evidence of conduct preceding prior custody order is admissible to corroborate evidence of similar conduct that has developed since prior order ). Viewing all the evidence in the light most favorable to the judgment, we conclude that a reasonable factfinder could have formed a "firm belief or conviction" that Beth engaged in conduct that endangered the physical or emotional well-being of her children. *See* Tex. Fam. Code § 161.001(1)(E). Accordingly, we conclude that the evidence is legally sufficient to support the trial court's finding of grounds to terminate Beth's parental rights.

With regard to the factual sufficiency of the evidence to support an endangerment finding under section 161.001(1)(E), the disputed evidence predominantly concerns the accounts of Beth's physical and verbal altercations with Jack and Kim, which she denied, explained, or attempted to downplay. The trial court, however, expressly found that Beth was not credible, and credibility determinations are exclusively within the fact-finder's province. The court also heard testimony from several witnesses that Beth held a genuine belief that her children had been sexually abused and that an independent mental-health professional had reported that P.M. had exhibited "red flags or

30

behavioral markers consistent with [the] alleged abuse."[10]  Other witnesses, however, testified that even if Beth's belief was genuine, she acted inappropriately in responding to that belief and that her daughters were harmed emotionally as a result.  In considering the record as a whole, we must defer to the trial court's determination that Beth was not credible.  We further conclude that even considering the disputed evidence, the trial court could have formed a firm conviction or belief that Beth had engaged in a course of conduct that endangered the children's physical or emotional well-being.  *Id.*  We overrule appellate issue two.

The best-interest issue is closer.  Beth's third appellate issue challenges the legal and factual sufficiency of the evidence to support the trial court's best-interest finding.  There are several factors that courts are to consider when determining what is in a child's best interest.  *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).  The factors include but are not limited to (1) the child's desires; (2) the child's emotional and physical needs now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent.  *Id.*  No one factor is controlling, but in some cases evidence of a single factor may

---

[10]  According to Stacy Helms, the Clinical Director of the Children's Advocacy Center, when P.M. first began receiving therapy following the initial sexual-abuse allegations, she exhibited poor boundaries, "hyper-sexualized behavior for her developmental age," and a fear of men, especially men of authority and father figures.

be sufficient to support a finding that termination is in the child's best interest. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d 256, 267 & n.39 (Tex. 2002). Some of the *Holley* factors are not implicated or strictly applicable in the present case, and others are overlapping. Accordingly, to the extent applicable, we consider the *Holley* factors in our analysis of the evidence adduced at trial as it bears on the trial court's best-interest finding.

A parent's statutorily offensive conduct is often intertwined with the best-interest determination. *Horvatich v. Texas Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 601 (Tex. App.—Austin 2002, no pet.). In the present case, as discussed above, there is legally and factually sufficient evidence that from 2009 to mid-2012 Beth engaged in a course of conduct that endangered the psychological and emotional well-being of the children. There is likewise evidence that Beth has displayed personality extremes in the past that have resulted in domestic violence, which is some evidence of a potential for future emotional or physical danger to the children and instability in their familial relationships. Buie testified that the children are still suffering emotionally, have expressed fear and anxiety about living with Beth, have expressed concern that the improvement in Beth's behavior is temporary, and have expressed concern that Beth will harm their father or Kim. P.M. has also openly worried that Beth does not want her to have a relationship with Jack. Moreover, in the past, Beth resisted or repelled services and therapy offered to help her and the children.

It appears undisputed, however, that in the year preceding the termination trial Beth had made significant improvements in her behavior, progressed in her ability to co-parent with Jack, and worked to repair her relationship with the children. Jack, Buie, and Gaines all testified that there

had been no issues with Beth during that time period; in fact, Jack testified that Beth had been on "her best behavior" during that time. There is also evidence that Beth's past conduct, although inappropriate and damaging to the children, was fueled in part by an erroneous belief that Jack had sexually molested P.M. The witnesses presented conflicting testimony as to whether Beth's belief was genuine or fabricated. Buie and Gaines testified that Beth's belief appeared genuine. Helms testified that, when she became involved in the case, P.M. displayed "red flags or behavioral markers consistent with the alleged abuse." Moreover, there is at least some evidence that Beth's behavior showed marked improvement after P.M. recanted, but the improvement also occurred in the structured environment of supervised visitation. Nevertheless, after P.M. recanted, Beth was able to engage the process of learning to co-parent with Jack and begin repairing the damage caused to the children. Gaines also testified that Beth had learned to ask for guidance on how to respond appropriately in a given situation and had asked Gaines to remain involved with her and the children for some time going forward, even if she were granted equal custody as she had anticipated. Gaines took these as signs that Beth had changed for the better, and it is certainly a contrast from Beth's response to assistance offered by Helms and others in the spring of 2012.

Jack testified that leading up to the termination trial, he did not believe that termination of Beth's parental rights would necessarily be in the children's best interest. He admitted that the girls were sad and confused when they missed visits with Beth and that termination of their relationship with her would be hard on them. He further testified, however, that at the time of trial, he firmly believed that termination was in the children's best interest based on Beth's recent arrest for methamphetamine possession, which was disturbing to him as well as to Buie and Gaines. Both

33

Buie and Gaines testified that an active drug problem, if not treated, would create the potential for harm to the children, and both were concerned that Beth had not promptly disclosed the arrest to them.

Although there is no evidence that Beth had been convicted of any drug offense as of the termination trial, a criminal conviction is not required for the factfinder to consider the underlying conduct as it relates to the best interest of the child. *See, e.g.*, *In re V.V.*, 349 S.W.3d 548, 557-58 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Texas courts routinely consider evidence of parent-on-parent physical abuse in termination cases without specifically requiring evidence that the conduct resulted in a criminal conviction."); *In re J.W.*, 113 S.W.3d 605, 612 (Tex. App.—Dallas 2003, pet. denied) (trial court did not abuse discretion in denying motion to suppress evidence of father's arrest for beating child and mother's arrest for failing to report son's sexual abuse of daughter because parents' arrests and pending prosecutions were relevant in determining whether retention of parental rights was in children's best interest). Through her denial of culpability in response to questioning, Beth provided the only evidence concerning the circumstances of her arrest, but the trial court expressly found Beth not credible. Leaving the arrest aside, it is reasonable to infer from Beth's prior unstable conduct and her lack of credibility that, at a minimum, (1) there continues to be a risk of present and future emotional danger to the children, (2) she lacks the judgment to make responsible parenting choices, and (3) maintaining the existing parent-child relationship is not appropriate.

Gaines, who has nearly 35 years' experience supervising visitation in similar cases and who was the only witness with direct knowledge of Beth's interactions with the children in the preceding year and a half, testified that (1) it would "absolutely not" be in P.M.'s and B.M.'s best

interest to terminate Beth's parental rights, (2) any concerns about Beth's access to the children was based solely on the questions raised by her recent arrest, and (3) those concerns could be adequately addressed by requiring supervised visitation in lieu of terminating Beth's parental rights. Gaines testified that the girls love Beth very much and have expressed a desire to see more of her. However, she testified that termination of parental rights might be warranted if it has been "really bad for the kids over a while and won't be corrected." Gaines affirmed that Beth's conduct had been really bad for several years before Gaines's involvement in the case, but in her opinion, Beth had demonstrated enough change to retain her parental rights.

Buie testified that termination of parental rights is generally not in the best interest of the children, although she agreed that termination could be justified on the basis of really bad conduct over a long period of time that does not appear to be changing. However, since supervised visitation began more than a year before trial, Buie had no knowledge of any behavior by Beth that had been inappropriate and, although harboring lingering emotional issues, the girls had expressed that things were going very well with Beth. Buie explained that it would take time and therapy for the girls to work through past issues with Beth and that they had been actively engaged in that process. Buie also testified that the girls are very connected with Beth and desire to spend more time with her, including unsupervised and overnight visitation. Buie stated that based on the recent drug charge, however, it would not be safe for the children to live with Beth and, if visitation were to continue, it should be supervised at this point.

Although there is ample evidence of Beth's endangering conduct and anger-management issues in the past, there is also evidence of significant improvement in or

35

elimination of those issues in the 12 to 15 months preceding trial. Further, the evidence is undisputed that (1) the children are bonded and connected to Beth and desire both contact and a continued relationship with her; (2) the children were actively processing through their past issues with Beth, and the situation had improved to the point that the girls had requested increased amounts of unsupervised time with her; and (3) Beth had been responding appropriately to the children and seeking guidance and support from Gaines, which showed considerable personal, emotional, and parental growth on her part.

The uncertainties surrounding Beth's arrest and the criminal and endangering conduct it implicates clearly had a profound effect on the key witnesses and the trial court. Until Beth was arrested, Jack questioned whether termination would be in the children's best interests given their attachment to their mother; Gaines believed that Beth had shown enough growth to be reinstated as a full-time parent; and Buie had expressed to Gaines that termination would not be in the children's best interest. *Cf. Holley*, 544 S.W.2d 372-73 (finding evidence legally insufficient to support finding that termination was in child's best-interest where mother's failure to support child was excused, evidence showed child had emotional relationship with mother, and father testified that it would not be in child's best interest to never see his mother again). Although the arrest raised valid and genuine concerns as to Beth's judgment, stability, and parenting abilities, the arrest, in and of itself, did not prove actual criminal conduct.

Nonetheless, the key witnesses were uniform in their belief that the arrest raised grave concerns about the children's safety now and in the future. Giving deference to the trial court's credibility determination, there is a reasonable inference that Beth has not changed sufficiently and

36

that the past is prologue in this case. The trial court could reasonably have inferred that Beth's more remote conduct implicated her parental fitness at the time of trial such that it was in the children's best interest to terminate her parental rights. *Cf. Danet v. Bhan*, __ S.W.3d __, __, No. 13-0116, 2014 WL 2896005, at *4-5 (Tex. June 27, 2014).

Considering the disputed and undisputed evidence in the record, we conclude that there is both legally and factually sufficient evidence from which a reasonable factfinder could have formed a firm belief or conviction that termination of parental rights would be in the children's best interest on the record before the court. Beth's third appellate issue is overruled.

## CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed:  July 17, 2014

37