**Opinion issued December 7, 2023**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-23-00530-CV**

———————————

**IN RE K.W. A/K/A K.D., A CHILD**

———————————

**On Appeal from the 306th District Court**
**Galveston County, Texas**
**Trial Court Case No. 21-CP-0103**

———————————

**MEMORANDUM OPINION**

This is a suit by the Texas Department of Family and Protective Services ("DFPS") to terminate a parent-child relationship. After a bench trial, the trial court terminated the parental rights of appellant B.D. ("Father") to his minor child, K.W., also known as K.D. ("Kevin"),[1] based on its findings under subsections

---

[1] We use an alias to refer to the child and his parent. *See* TEX. R. APP. P. 9.8(b)(2) (in parental-rights termination cases, "the court must, in its opinion, use an alias to refer

161.001(b)(1)(N), and (O) of the Texas Family Code and its finding that termination of the parent-child relationship was in the child's best interest.[2] The trial court appointed DFPS as the managing conservator of the child.

In this accelerated appeal, Father challenges the trial court's order terminating his parental rights. In his sole issue, he contends that the evidence at trial was legally and factually insufficient to support the trial court's findings that he engaged in the predicate acts set forth in subsections 161.001(b)(1)(N) and (O), and that termination of his parental rights is in Kevin's best interest.

We affirm.

## Background

Kevin was born in a prison hospital in October 2021. DFPS was appointed his temporary managing conservator,[3] and Kevin was placed in a foster home with his siblings.

One year later, on September 13, 2022, Father was formally adjudicated as Kevin's father. After a hearing on that date, the trial court issued an agreed order stating that Father was to have supervised visitation with Kevin on the specific dates

---

to a minor, and if necessary to protect the minor's identity, to the minor's parent or other family member"). In its brief, DFPS refers to the child as "Kevin."

[2] *See* TEX. FAM. CODE § 161.001(b)(1)(N) (constructive abandonment), (O) (failure to comply with terms of family service plan), (b)(2) (best interest).

[3] Kevin's mother, D.P., executed an affidavit relinquishing her parental rights. The trial court found her relinquishment to be in Kevin's best interest and signed an order terminating her parental rights. She is not a party to this appeal.

2

set forth in September, October, and November 2022, absent mutual agreement. It ordered Father to show proof of income or an ability to support Kevin; demonstrate safe and stable housing; participate in case-related hearings and visitation with the child; and complete a psychosocial evaluation, drug testing, and, if positive, a drug and alcohol assessment. The trial court stated in its order that Father's compliance with these terms was required to obtain Kevin's return and that a failure to comply could result in the termination of his parental rights.

At trial, DFPS caseworker Colin Grey testified that Father did not provide evidence of income or an ability to support Kevin, or of a stable home life. Father stayed in a trailer with his father or stayed with his mother.

Grey testified that Father did not attend any of his scheduled visits with Kevin and did not attend the permanency hearing in December 2022. Instead, Father texted Grey over a borrowed cell phone each time, stating that he could not attend for various reasons, e.g., he was in the hospital with his girlfriend and new baby, his girlfriend had overdosed, the appointment time was confusing, or he lacked transportation. Grey provided Father with bus passes and attempted to reschedule visitations. Father had very little communication with DFPS after December 2022.

In April 2023, Father met Kevin for the first time. However, there were no additional visits because Father was arrested and jailed a few days later on charges

of smuggling and evading arrest. And Father was incarcerated at the time of trial in June 2023.

With respect to Father's criminal history, the trial court also admitted evidence that Father was charged on March 8, 2023 with the offenses of family-violence assault causing bodily injury, evading arrest, and criminal trespass. He was jailed and then released. The trial court also admitted a July 15, 2021 judgment of conviction for family-violence assault causing bodily injury, for which Father was jailed for 45 days, and a May 3, 2021 order of deferred adjudication for felony criminal negligence, involving abandoning or endangering a child, for which Father was placed on community supervision for two years.

DFPS also presented evidence that Father's drug tests on September 15, 2022 and December 8, 2022 were positive for amphetamine, methamphetamine, and marijuana. Grey testified that he made "at least four" attempts, including traveling to Father's house and while Father was incarcerated, to schedule Father for the court-ordered drug and alcohol assessment, but was unsuccessful. Grey was concerned that Father had "a pattern stemming back from years [of] drug use" and that there had not been "any therapeutic services to address those concerns."

Grey further testified that Kevin had lived since birth in a stable foster home that intended to permanently adopt him. He was bonded with his foster mother, his physical and emotional needs were being met, and he was a happy child. In addition,

4

Kevin's two older siblings lived with him, and together the children were thriving. Grey noted that although DFPS had investigated whether Kevin's paternal grandmother could provide a suitable placement for Kevin, it had learned that the grandmother had criminal history and had recently been incarcerated.

DFPS requested that the trial court terminate Father's parental rights to Kevin under subsections 161.001(b)(1)(N) and (O) of the Family Code. Grey opined that termination of Father's parental rights was in Kevin's best interest.

Father testified that he and Mother were in a relationship from 2020 to 2021. According to Father, he and Mother had used methamphetamine together during that time. Father noted that he began using methamphetamines when was he was 12 or 13 years old and had never undergone substance abuse treatment. He admitted to having a drug addiction and that he had failed to complete the court-ordered drug and alcohol assessment, despite his attorney and Grey having come to his home to assist him with setting it up. He asserted that he had not used drugs since his positive test in December 2022.

Father also admitted that he had agreed to the times and locations for visitation in the trial court's agreed order and that he had told the trial court that he did not have a vehicle but could get rides from his girlfriend. He admitted that he did not visit Kevin as agreed, but asserted that he had texted Grey each time to explain the reason. For instance, he missed the first visit, scheduled for September 16, 2022,

5

because his girlfriend gave birth to his new baby on September 15, 2022. He missed the October 2022 visits because his girlfriend was getting her driver's license on one of the days. And he asserted that Grey had failed to tell him where the November 2022 visit would take place. He did not appear for the permanency hearing in December 2022 because his girlfriend overdosed on alcohol and drugs.

Father stated that he met Kevin for the first time in April 2023 and was arrested days later on charges of smuggling and evading arrest in Kinney County. And he was incarcerated at the time of trial and unsure of when he would be released. He also noted that he had been involved in "multiple incidents" of domestic violence. He admitted that he could not provide Kevin with a safe and stable home but asserted that he could do so "through [his] mother."

Kevin's paternal grandmother testified regarding her criminal history, which included felony forgery and possession of a controlled substance in 2019. In September 2021, she was arrested for the felony offense of unauthorized use of a motor vehicle and for possession of methamphetamine, which constituted violations of the terms of her community supervision, and she was incarcerated for eighteen months. She was released on parole two months prior to her testimony at trial and noted that she would be on parole for "two more years." She testified that she had found employment and had been living in her new home for "a couple weeks." She noted that she had strong support from relatives.

6

CASA advocate supervisor Y. Ramirez testified that she had visited Kevin at his foster home monthly since this case began. Kevin was bonded to his foster mother and attached to his biological siblings, who also lived there. He was in a stable environment, attended day care, and the family took many vacations together.

Ramirez was concerned about Father's history of criminal conduct, substance abuse, and domestic violence—as some of these events took place even after Father had taken parenting classes. She was concerned about placing Kevin with his paternal grandmother based on her recent history of criminal conduct and substance abuse. Although the grandmother had taken strides to improve herself, it had only been for a short time. And Ramirez was not provided with the names of any other relatives who could provide placement for Kevin.

In its Order of Termination, the trial court found that Father had constructively abandoned Kevin and had failed to comply with a court order establishing the actions necessary for him to obtain Kevin's return. It also found that termination of the parent-child relationship between Father and Kevin was in Kevin's best interest. The trial court terminated Father's parental rights and appointed DFPS as Kevin's permanent managing conservator.

## Termination of Father's Parental Rights

In his sole issue, Father argues that the evidence at trial was legally and factually insufficient to support the trial court's findings that he engaged in the predicate acts set forth in subsection 161.001(b)(1)(N) of the Family Code and that termination of his parental rights was in Kevin's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(N), (b)(2).[4]

### A.    *Standard of Review*

A parent's "right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Id*. at 759. "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." *Id*. (internal quotations omitted). Thus, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

---

[4]    Because we conclude below that the evidence is legally and factually sufficient to support the trial court's finding under Family Code section 161.001(b)(1)(N), we do not address Father's challenge to the termination of his parental rights under section 161.001(b)(1)(O). *See* TEX. R. APP. P. 47.1; *see also In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (requiring only one predicate finding under section 161.001 to support termination when there is also finding that termination is in child's best interest).

"[T]he rights of natural parents are not absolute," however, "protection of the child is paramount," and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)). As a parent may forfeit his parental rights based on his actions or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id.*

Accordingly, "[i]n parental-rights termination cases, due process mandates a clear and convincing evidence standard of proof." *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019); *see also* TEX. FAM. CODE § 161.001(b). "Clear and convincing" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "This heightened burden of proof affects the standard of review in an evidentiary challenge on appeal." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022).

"To that end, in reviewing a legal-sufficiency challenge, we must determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* (internal quotations omitted). We consider all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that the factfinder could have disbelieved. *Id.* We may not,

however, disregard "undisputed facts that do not support the finding. *Id*. (quoting *In re J.F.C.*, 96 S.W.3d at 266 (internal quotations omitted)).

In conducting a factual-sufficiency review in this context, we determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably could have formed a firm belief or conviction that the finding was true. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

Under these standards, the factfinder remains "the sole arbiter of the witnesses' credibility and demeanor." *In re J.W.*, 645 S.W.3d at 741 (internal quotations omitted). Thus, in a bench trial, the trial court weighs the evidence and resolves evidentiary conflicts and inconsistencies. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

**B.**    *Law*

Section 161.001(b) of the Family Code authorizes an "involuntary termination of parental rights if a court finds by clear and convincing evidence both that a parent engaged in one or more enumerated predicate grounds for termination and that

termination is in the best interest of the child." *In re M.P.*, 639 S.W.3d 700, 701–02 (Tex. 2022); *see* TEX. FAM. CODE § 161.001(b). Generally, only one predicate ground and a best-interest finding are necessary for termination, even if the trial court based the termination on more than one ground. *In re M.P.*, 639 S.W.3d at 702.

Here, the trial court found that:

(N) [Father had] constructively abandoned the child who has been in the permanent or temporary managing conservatorship of [DFPS] for not less than six months, and:

(i) [DFPS had] made reasonable efforts to return the child to the parent;

(ii) [Father had] not regularly visited or maintained significant contact with the child; and

(iii) [Father had] demonstrated an inability to provide the child with a safe environment[.]

TEX. FAM. CODE § 161.001(b)(1)(N). The first element focuses on DFPS's conduct, and the second and third focus on the parent's conduct. *In re A.K.L.*, No. 01-16-00489-CV, 2016 WL 7164065, at *6 (Tex. App.—Houston [1st Dist.] Dec. 8, 2016, pet. denied) (mem. op.).

## C. *Discussion*

Father does not dispute that Kevin was in the temporary conservatorship of DFPS for at least six months. *See* TEX. FAM. CODE § 161.001(b)(1)(N). Rather, he disputes that the evidence supports that DFPS made reasonable efforts to return Kevin to him, that he did not regularly visit or maintain significant contact with

11

Kevin, and that he demonstrated an inability to provide Kevin with a safe environment. *See id.*

### 1. Reasonable efforts to return the child

Under section 161.001(1)(N)(i), efforts by DFPS to return the child to the parent do not require that the child be "physically delivered" to the parent. *In re G.C.S.*, 657 S.W.3d 114, 132 (Tex. App.—El Paso 2022, pet. denied). This Court and others have held that DFPS's implementation of a family service plan, "standing alone," constitutes a reasonable effort to return a child to the parent. *In re S.M.M.*, No. 01-22-00482-CV, 2022 WL 17981669, at *7 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied) (mem. op.); *A.D. v. Tex. Dep't of Family & Protective Servs.*, 673 S.W.3d 704, 714 (Tex. App.—Austin 2023, no pet.).[5] The inquiry is whether DFPS made "reasonable efforts, not ideal efforts." *In re F.E.N.*, 542 S.W.3d 752, 766–67 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).

Here, DFPS filed a service plan with respect to Father within 45 days after it was appointed the temporary managing conservator of the child, as required. *See* TEX. FAM. CODE § 263.101. And DFPS provided the plan to Father and communicated with him about its terms. At that time, however, he was only an

---

[5] *See also In re I.M.*, No. 01-21-00123-CV, 2021 WL 3868764, at *5 (Tex. App.—Houston [1st Dist.] Aug. 31, 2021, no pet.) (mem. op.); *In re A.M.E.*, No. 01-21-00214-CV, 2021 WL 4533262, at *6 (Tex. App.—Houston [1st Dist.] Oct. 5, 2021, no pet.) (mem. op.); *M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 309 (Tex. App.—El Paso 2009, pet. denied),

alleged father. *See In re S.M.M.*, 2022 WL 17981669, at *7 (noting that service plan applies only to "parent," not to alleged father). Accordingly, once Father was formally adjudicated as Kevin's father, Father and DFPS agreed on the specific provisions constituting an amended service plan, and the trial court issued an agreed order listing the services with which Father was required to comply to obtain the return of the child.

These terms included that Father was to participate in supervised visitation with Kevin on the specific dates set forth in September, October, and November 2022, unless otherwise agreed. Father was also ordered to show proof of income or an ability to support Kevin; to demonstrate safe and stable housing; to participate in case-related hearings and visitation with the child; to complete a psychosocial evaluation, a drug test, and, if positive, a drug and alcohol assessment. The trial court's order also specified that a failure to comply with these terms could result in the termination of Father's parental rights.

Grey testified regarding DFPS's implementation of the amended service plan and the efforts to assist Father with compliance. *See In re I.M.*, No. 01-21-00123-CV, 2021 WL 3868764, at *5 (Tex. App.—Houston [1st Dist.] Aug. 31, 2021, no pet.) (mem. op.). Father did not attend any of his scheduled visits with Kevin, with the exception of one, and he failed to maintain contact with DFPS. Father was without a telephone, although Grey attempted to reach him through his girlfriend.

In addition, Grey's efforts included going to Father's home to communicate with him, providing Father with bus passes, and attempting to reschedule visitation.

In addition, after Father's failed drug tests, Grey made "at least four" attempts, including traveling to Father's home and during Father's incarceration, to assist him with scheduling the court-ordered alcohol and drug assessment, but was unsuccessful.

Further, DFPS explored the possibility of placing Kevin with his paternal grandmother but determined that she was not equipped to provide him with a safe and stable home. And DFPS determined that Father had no other relatives who could care for Kevin. Such efforts to place Kevin with a relative, though unsuccessful, constitute evidence that reunification was attempted. *See In re G.C.S.*, 657 S.W.3d at 132; *In re K.J.T.M.*, No. 06-09-00104-CV, 2010 WL 1664027, at \*3 (Tex. App.—Texarkana Apr. 27, 2010, no pet.) (mem. op.) (attempts, "although futile," to place child with relative supported finding of reasonable effort to return child to father).

From the evidence presented, a reasonable factfinder could have formed a firm belief or conviction that DFPS made reasonable efforts to return Kevin to Father. *See In re G.P.*, 503 S.W.3d 531, 533 (Tex. App.—Waco 2016, pet. denied).

**2.      Regularly visiting or maintaining significant contact with the child**

Kevin was born in October 2021, and Father was formally adjudicated as his father in September 2022. Father admitted that he had agreed to the times and

locations for visitation in the trial court's agreed order and that he had represented that he had a means of transportation to the visits. He admitted at trial, however, that he did not visit Kevin as agreed. And Grey testified that Father failed to maintain contact with DFPS after December 2022. Father's only visit during the seven-month period between his adjudication and trial was in April 2023, when he met Kevin for the first time.

This Court has found sufficient evidence of constructive abandonment despite greater levels of contact with a child than Father had in this case with Kevin. *See In re J.Q.J.*, No. 01-18-01094-CV, 2019 WL 2292991, at *5 (Tex. App.—Houston [1st Dist.] May 30, 2019, no pet.) (mem. op.) (holding reasonable factfinder could have formed firm belief or conviction that parent who visited three times during seven months that child was in DFPS care had failed to regularly visit or maintain significant contact).[6]

Here, the evidence shows that Father had no relationship with Kevin at all. *See In re S.C.M.*, No. 01-22-00964-CV, 2023 WL 3873342, at *9 (Tex. App.— Houston [1st Dist.] June 8, 2023, pet. denied) (mem. op.).

---

[6]     *See also In re T.G.*, No. 14-09-00299-CV, 2010 WL 1379977, at *7 (Tex. App.— Houston [14th Dist.] Apr. 8, 2010, no pet.) (mem. op.) (parent who visited "only sporadically" for nine months and did not visit at all for seven months after failed to regularly visit or maintain significant contact); *M.C.*, 300 S.W.3d at 310 (mother who visited six to eight times during twelve-month period failed to regularly visit or maintain significant contact); *In re H.R.*, 87 S.W.3d 691, 699 (Tex. App.—San Antonio 2002, no pet.) (parent visited "intermittently" during four-month period).

Father testified that he texted Grey each time to explain the reason that he could not attend the scheduled visit. Father missed the first visit, scheduled for September 16, 2022, because his girlfriend gave birth to his new baby the day before, on September 15, 2022. He stated that he missed the October 2022 visits because his girlfriend was getting her driver's license on one of the days. And he asserted that Grey had failed to tell him where the November 2022 visit would take place. Father additionally did not appear for the permanency hearing in December 2022 because his girlfriend had overdosed on alcohol and drugs.

Based on this record, the trial court could have reasonably found Father's explanations to be inadequate. *See In re J.W.*, 645 S.W.3d at 741 (factfinder remains "the sole arbiter of the witnesses' credibility and demeanor" (internal quotations omitted)); *In re R.J.*, 579 S.W.3d at 117 (factfinder weighs evidence and resolves evidentiary conflicts).

A reasonable factfinder could have therefore formed a firm belief or conviction that Father failed to regularly visit or maintain significant contact with Kevin. *See In re J.Q.J.*, 2019 WL 2292991, at *5.

### 3. Safe environment

Factors relevant to a parent's ability to provide a safe environment include (1) the degree to which the parent participated in services; (2) whether the parent has steady housing and employment; and (3) whether the parent missed opportunities

for counseling and a psychological evaluation. *In re S.M.M.*, 2022 WL 17981669, at *9. "The factfinder should also consider a parent's financial resources, employment history, home environment, parenting skills, and demonstrated past ability or inability to care for a child." *Id.* (internal quotations omitted). The burden is not on the parent to prove that he can provide a safe environment for the child; rather, the burden is on DFPS, as the party seeking a termination of parental rights, to prove that the parent is unable to provide a safe environment for the child. *Id.*

With respect to participating in services and missed opportunities for counseling and evaluation, the evidence shows that Father did not participate any of his scheduled visits with Kevin, with the exception of one. In addition, he failed drug tests in September and December 2022, and admitted that he was an addict, yet failed to participate in a drug and alcohol assessment as ordered. *See id.* The failure to complete a family service plan demonstrates an inability to provide a child with a safe environment. *See In re A.K.L.*, 2016 WL 7164065, at *7.

Additionally, the evidence shows that Father lacked an ability to support Kevin and was without stable housing. *See In re S.M.M.*, 2022 WL 17981669, at *9. Father admitted that he could not provide Kevin with a safe and stable home but asserted that he could do so "through [his] mother." However, the evidence shows that his mother had a recent history of criminal conduct and substance abuse. Although she testified that she had, a couple weeks prior to trial, moved into a home

17

of her own and had obtained employment, "[e]vidence of a recent improvement does not absolve . . . a history of irresponsible choices." *In re E.M.*, 494 S.W.3d 209, 226 (Tex. App.—Waco 2015 pet. denied).

Further, the evidence shows that Father had a pattern of engaging in criminal conduct and domestic violence, and he was in jail at the time of trial. Conduct that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child and supports a conclusion that Father cannot provide a safe environment. *See id.*; *see also In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ) (parent's past criminal conduct, before and after child's birth, relevant to showing of inability to parent).

From the evidence presented, a reasonable factfinder could have formed a firm belief or conviction that Father was unable to provide Kevin with a safe environment. *See In re S.C.M.*, 2023 WL 3873342, at *9–10; *M.C. v. Tex. Dept. of Family & Protective Servs.*, 300 S.W.3d 305, 310 (Tex. App.—El Paso 2009, pet. denied) (holding evidence that parent had no permanent housing or employment demonstrated inability to provide child with safe environment).

Viewing all the evidence in a light most favorable to the trial court's finding, and considering undisputed contrary evidence, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Father constructively

18

abandoned Kevin. *See In re J.W.*, 645 S.W.3d at 741; *In re I.M.*, 2021 WL 3868764, at \*5–6; *In re J.Q.J.*, 2019 WL 2292991, at \*5; *In re S.C.M.*, 2023 WL 3873342, at \*9–10 (holding evidence that father had no relationship with child, visited only one time, had no employment, financial resources, or stable housing, and had engaged in criminal conduct sufficient to support trial court's conclusion that he had constructively abandoned his child).

Furthermore, considering the entire record, including evidence both supporting and contradicting the finding, the trial court reasonably could have formed a firm belief or conviction that Father constructively abandoned Kevin. *See In re C.H.*, 89 S.W.3d at 25–26; *In re I.M.*, 2021 WL 3868764, at \*5–6; *In re J.Q.J.*, 2019 WL 2292991, at \*5; *In re S.C.M.*, 2023 WL 3873342, at \*9–10. Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's finding pursuant to section 161.001(b)(1)(N) of the Family Code. *See* TEX. FAM. CODE § 161.001(b)(1)(N).

### *Best Interest*

Father also contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in Kevin's best interest.

The best-interest inquiry focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018).[7] A best-interest determination is guided by several non-exclusive factors, including: (1) the child's emotional and physical needs; (2) present and future emotional and physical danger to the child; (3) the parental abilities of the individuals seeking custody; (4) the plans for the child by those individuals and the stability of the home; (5) the plans for the child by the agency seeking custody and the stability of the proposed placement; (6) the parent's acts or omissions that may indicate the existing parent–child relationship is improper; and (7) any excuse for the parent's acts or omissions. *Id.* (the "*Holley* factors," citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). We may also consider the statutory factors set forth in section 263.307 of the Family Code. *See* TEX. FAM. CODE § 263.307; *In re A.C.*, 560 S.W.3d at 631 n.29.

Proof of each of these factors is not a condition precedent to termination. *In re C.H.*, 89 S.W.3d at 27. The analysis may include direct and circumstantial evidence, the totality of the evidence, and subjective factors. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

---

[7] Proof of acts or omissions providing grounds for termination under section 161.001(b)(1) does not relieve the petitioner from proving the best-interest element, but the same evidence may be probative of both. *In re A.C.*, 560 S.W.3d 624, 631–32 (Tex. 2018).

Based on these standards, several factors support the trial court's finding here that termination of Father's parental rights is in Kevin's best interest.

At the time of trial, Father had met Kevin one time and had no relationship with him, and Father did not maintain contact with DFPS. Unless a parent has a valid excuse for his absence from a child's life, we have long considered evidence of little or no contact with the child to be proof that weighs heavily in favor of a trial court's best-interest finding. *See In re A.J.D.-J.*, 667 S.W.3d 813, 824 (Tex. App.—Houston [1st Dist.] 2023, no pet.) ("Parental absence or lack of involvement is especially telling with respect to the best interest of very young children, like babies and toddlers, due to their inherent vulnerability and particular need for parental attention and nurturing.").

Father presented evidence that he texted Grey each time that he was scheduled to participate in visitation and explained that he could not attend for various reasons, e.g., he was in the hospital with his girlfriend and new baby (born the day before), his girlfriend had overdosed, the appointment time was confusing, or he lacked transportation. The trial court could have chosen to disbelieve some of Father's explanations or could have reasonably found them inadequate for his failing to have any contact with his child, apart from one time, for seven months. *See In re J.W.*, 645 S.W.3d at 741 (factfinder remains "the sole arbiter of the witnesses' credibility

21

and demeanor" (internal quotations omitted)); *In re R.J.*, 579 S.W.3d at 117 (factfinder weighs evidence and resolves evidentiary conflicts).

In addition, Father failed to attend the permanency hearing in December 2022. When a parent fails to attend termination proceedings without a valid excuse, "the factfinder may reasonably infer that the parent is indifferent to the outcome." *In re A.J.D.-J.*, 667 S.W.3d at 826. "[I]ndifference implicates all of the *Holley* factors." *Id.* at 827.

Father asserted that he was absent from the hearing through no fault of his own, but because his girlfriend—who had just given birth to Father's new baby 90 days prior—had overdosed. Apart from whether the trial court reasonably found his excuse to be valid, the trial court could have reasonably inferred that Kevin's safety would be at risk in such an environment. *See In re A.C.*, 560 S.W.3d at 631.

Drug use is relevant, not only to parenting abilities and to the stability of the home a parent would provide, but also to the emotional and physical needs of the child, now and in the future, and to the emotional and physical danger in which the child could be placed, now and in the future. *See In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *see also In re A.C.*, 560 S.W.3d at 631–32 (holding that same evidence may be probative of both section 161.001(b)(1) and best-interest grounds). A factfinder may afford great weight to the significant

22

factor of drug-related conduct. *In re M.L.G.J.*, 14-14-00800-CV, 2015 WL 1402652, at *6 (Tex. App.—Houston [14th Dist.] Mar. 24, 2015, no pet.) (mem. op.).

Here, Father admitted that he had a long-established history of using methamphetamines and had never undergone substance abuse treatment. Despite failing drug tests and admitting that he was an addict, Father failed to participate in a drug and alcohol assessment as ordered. And evidence of Father's past drug use, coupled with evidence that Father failed drug tests during the pendency of this suit— while he was aware that his parental rights to Kevin were at issue—supports an inference that Father is at risk for continuing substance abuse. *See In re R.J.*, 579 S.W.3d at 118 (trial court may measure parent's future conduct by his past conduct).

Further, there was significant evidence presented of Father's history of engaging in criminal conduct—including child endangerment—and domestic violence. *See In re J.W.*, 113 S.W.3d 605, 612 (Tex. App.—Dallas 2003, pet. denied) ("[E]vidence of . . . arrests and pending prosecutions [is] relevant in determining whether allowing [parents] to retain their parental rights would be in the children's best interest.").

Conversely, with respect to the foster parent's ability to parent Kevin and provide a stable home, Grey and Rodriguez testified that Kevin is in a safe, stable home and that he is bonded with his foster parent and siblings. At the time of trial, Kevin was eighteen months old. "When children are too young to express their

desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Here, the record shows that Kevin has spent his entire life with his foster family. *See id.* Grey and Rodriguez testified that Kevin is a happy child, his physical and emotional needs are being met, and he is thriving. *See id.; see also In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.) (considering, in assessing child's physical and emotional needs, that child was "healthy, happy, and well-adjusted" after approximately eighteen months in care of foster family). Grey also testified that the foster family intends to adopt him. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (stating that stability and permanence are important to upbringing of child and affirming finding that termination was in child's best interest when child was thriving in foster care).

Thus, viewing all the evidence in a light most favorable to the trial court's best-interest finding, and considering undisputed evidence to the contrary, we conclude that a reasonable factfinder could have formed a firm belief or conviction that a termination of Father's parental rights is in Kevin's best interest. *See In re S.M.M.*, 2022 WL 17981669, at *12.

Furthermore, considering the entire record, including evidence both supporting and contradicting the trial court's finding, a factfinder reasonably could

24

have formed a firm belief or conviction that a termination of Father's parental rights is in Kevin's best interest. *See id.* Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See id.*

We overrule Father's sole issue.

## Conclusion

We affirm the trial court's judgment in all things.


Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Hightower and Countiss.